**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

FRANCES BROADDUS CRUTCHFIELD;
HENRY RUFFIN BROADDUS,
           *Plaintiffs-Appellees,*

v.

COUNTY OF HANOVER, VIRGINIA,
           *Defendant-Appellant,*

and

UNITED STATES ARMY CORPS OF
ENGINEERS,
                      *Defendant.*

GREATER RICHMOND PARTNERSHIP,
INCORPORATED; GREATER RICHMOND
CHAMBER OF COMMERCE; HANOVER
BUSINESS COUNCIL; LOCAL
GOVERNMENT ATTORNEYS OF
VIRGINIA, INCORPORATED; VIRGINIA
ASSOCIATION OF COUNTIES; VIRGINIA
ASSOCIATION OF MUNICIPAL
WASTEWATER AGENCIES,
INCORPORATED (VAMWA),
           *Amici Supporting Appellant.*

No. 02-1946

FRANCES BROADDUS CRUTCHFIELD;
HENRY RUFFIN BROADDUS,
                    *Plaintiffs-Appellees,*

                    v.

UNITED STATES ARMY CORPS OF
ENGINEERS,
                    *Defendant-Appellant,*

                    and

COUNTY OF HANOVER, VIRGINIA,
                    *Defendant.*                    No. 02-2153

GREATER RICHMOND PARTNERSHIP,
INCORPORATED; GREATER RICHMOND
CHAMBER OF COMMERCE; HANOVER
BUSINESS COUNCIL; LOCAL
GOVERNMENT ATTORNEYS OF
VIRGINIA, INCORPORATED; VIRGINIA
ASSOCIATION OF COUNTIES; VIRGINIA
ASSOCIATION OF MUNICIPAL
WASTEWATER AGENCIES,
INCORPORATED (VAMWA),
                    *Amici Supporting Appellant.*

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, District Judge.
(CA-02-253-3)

Argued: January 24, 2003

Decided: March 27, 2003

Before WILKINSON and MICHAEL, Circuit Judges, and
James H. MICHAEL, Jr., Senior United District Judge for the
Western District of Virginia, sitting by designation.

Reversed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Michael and Senior Judge Michael joined.

---

## COUNSEL

**ARGUED:** John Alan Bryson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant Corps; William Gray Broaddus, MCGUIREWOODS, L.L.P., Richmond, Virginia, for Appellant County. William B. Ellis, ELLIS & THORP, P.L.L.C., Richmond, Virginia, for Appellees. **ON BRIEF:** Thomas L. Sansonetti, Assistant Attorney General, Paul J. McNulty, United States Attorney, M. Hannah Lauck, Assistant United States Attorney, Greer S. Goldman, John A. Sheehan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Katherine D. Will, Assistant District Counsel, UNITED STATES ARMY CORPS OF ENGINEERS, Norfolk, Virginia, for Appellant Corps. Stewart T. Leeth, MCGUIRE-WOODS, L.L.P., Richmond, Virginia; Sterling Edward Rives, III, Barbara M. Rose, OFFICE OF THE COUNTY ATTORNEY, Hanover, Virginia, for Appellant County. Benjamin A. Thorp IV, ELLIS & THORP, P.L.L.C., Richmond, Virginia, for Appellees. Ralph L. Axselle, Jr., Walter H. Ryland, WILLIAMS MULLEN, P.C., Richmond, Virginia, for Amici Curiae Greater Richmond Partnership, Inc., et al. David Neal Anthony, KAUFMAN & CANOLES, Richmond, Virginia; Andrew R. McRoberts, Goochland County Attorney, Goochland, Virginia; Walter C. Erwin III, Lynchburg City Attorney, Lynchburg, Virginia; C. Flippo Hicks, General Counsel, VACo, Richmond, Virginia; Christopher D. Pomeroy, AquaLaw, P.L.C., Richmond, Virginia, for Amici Curiae Local Government Attorneys, et al.

---

## OPINION

WILKINSON, Circuit Judge:

Plaintiffs Frances Crutchfield and Henry Broaddus brought suit against the United States Army Corps of Engineers and the County of Hanover, Virginia to enjoin the construction of a wastewater treatment plant and its associated sewage conveyance systems and to

strike down the Army Corps' approval of those facilities. The district court upheld their challenge. *Crutchfield v. United States Army Corps of Eng'rs*, 214 F. Supp. 2d 593 (E.D. Va. 2002). Because the Army Corps is entitled to approve an applicant's project proposal under a less stringent Nationwide Permit regime even if the applicant initially requested a type of individual permit that would have required more rigorous review, and because there was sufficient evidence to support the Army Corps' decision to approve the project, we reverse.

I.

Hanover County is located in a rapidly-growing area north of Richmond, Virginia. In an effort to manage this growth and preserve some of the rural character of the region, county government has adopted a "Smart Growth" policy that concentrates development in a limited portion of the County known as the "Suburban Service Area." However, this rapid population growth has put significant pressure on the County's wastewater treatment infrastructure.

The County currently satisfies its need for wastewater treatment by using two of its own wastewater treatment facilities to process sewage from the northern part of the Suburban Service Area, and by sending sewage from the southern part to neighboring Henrico County for treatment and discharge. The contract with Henrico County allows Hanover County to send up to 5.4 million gallons per day (mgd) of wastewater for treatment at a Henrico County facility. Because it appears that Henrico County is unwilling to satisfy Hanover County's wastewater treatment needs beyond this contractual limit, Hanover County needs to develop supplementary means of treating wastewater generated by its continuing population growth.

After evaluating various options for dealing with this challenge, Hanover County decided to build its own wastewater treatment plant. The current proposal for that plant consists of (1) a pump station and a four-mile forcemain (collectively the "Lee Davis pipeline") which would convey wastewater from the pump station to the treatment site, (2) the wastewater treatment plant itself, (3) an eight-mile forcemain which would convey treated wastewater from the plant to the Pamunkey River, and (4) a discharge structure on the river bottom.

The project would permanently affect no more than two tenths of an acre of wetlands. Plaintiffs own approximately 900 acres of farmland adjacent to the Pamunkey River. Their land would be crossed by one of the forcemains, and the Pamunkey River discharge structure would be located adjacent to their property. They oppose the project and have filed numerous court challenges against it.

Because the project involves the placement of "dredged or fill material" in wetlands, Hanover County must get clearance from the Army Corps of Engineers before beginning construction. 33 U.S.C. § 1344(a) (2003). There are two different methods of obtaining Army Corps clearance for a project. First, the Corps can issue individual permits on a case-by-case basis. This requires a resource-intensive review that entails submission of voluminous application materials, extensive site-specific research and documentation, promulgation of public notice, opportunity for public comment, consultation with other federal agencies, and a formal analysis justifying the ultimate decision to issue or refuse the permit. *See* 33 C.F.R. §§ 320.4, 325.1-325.3 (2003). Alternatively, interested parties can try to fit their proposed activity within the scope of an existing general permit, which acts as a standing authorization for developers to undertake an entire category of activities deemed to create only minimal environmental impact. 33 U.S.C. § 1344(e) (2003); 33 C.F.R. §§ 320.1(c), 330.1(b)-(c) (2003).

The general permits at issue in this case are all Nationwide Permits (NWPs). Activities falling within the scope of an NWP are automatically authorized without any individualized inquiry, although preconstruction notification of the Corps is required in some cases. 33 C.F.R. § 330.1(e) (2003). In cases where preconstruction notification is required, the Corps will verify the applicability of the NWP to the proposed activity. 33 C.F.R. § 330.1(e)(2). Since NWPs are "designed to regulate with little, if any, delay or paperwork certain activities having minimal [environmental] impacts," NWP verification is much simpler than the individual permit process. 33 C.F.R. § 330.1(b) (2003). If the Corps has concerns about a proposed project, however, the Corps may exercise "discretionary authority" to restrict the otherwise automatic application of the NWP program while its concerns are addressed. 33 C.F.R. §§ 330.1(d), 330.5 (2003). The Corps' regulations also direct the Corps to review any incoming individual permit

application for potential eligibility under existing NWPs, even if the application itself does not so request. 33 C.F.R. § 330.1(f) (2003).

The current proposal is Hanover County's second major effort in recent years to develop infrastructure to support its "Smart Growth" policy. Originally, Hanover County submitted a significantly different proposal to the Army Corps for the new wastewater treatment plant. That draft of the project did not include the Lee Davis pipeline. Rather, under that proposal, wastewater would have been delivered to the new plant via a 5.6-mile pipeline called the Totopotomoy Creek Interceptor. An initial review by the Army Corps concluded that the Interceptor was the only element of the project that would have more than minimal impact on wetlands. The Corps therefore issued NWP verifications for all elements of the project except for the Interceptor (i.e., the treatment plant, the discharge forcemain, and the Pamunkey River discharge structure) and began to review the Interceptor as part of a separate application for an individual permit.

Plaintiffs brought suit in federal court challenging the NWP verifications. They argued that the County was attempting to improperly segment the Interceptor from the rest of the project and thereby evade the full measure of required regulatory scrutiny. Because the Interceptor was the only way to bring wastewater to the plant for treatment, the district court agreed. It vacated the verifications, enjoined further construction of the planned infrastructure, and ordered the Corps to consider the various project elements as an integrated whole. *Crutchfield v. United States Army Corps of Eng'rs*, 154 F. Supp. 2d 878 (E.D. Va. 2001) (remanding to Army Corps for reconsideration of the wastewater treatment project as a whole); *Crutchfield v. United States Army Corps of Eng'rs*, 192 F. Supp. 2d 444 (E.D. Va. 2001) (enjoining further construction on wastewater treatment project); *Crutchfield v. United States Army Corps of Eng'rs*, 175 F. Supp. 2d 835 (E.D. Va. 2001) (maintaining injunction against further plant construction).

After those rulings, Hanover County made substantial changes to the planned project and submitted a revised permit application to the Corps. The Totopotomoy Creek Interceptor, which had been the principal focus of plaintiffs' original complaint, was dropped from the application. The newly proposed Lee Davis pipeline was presented as a fully functional replacement for the Interceptor, with wastewater

flow capacity comparable to that of the Interceptor. Where the Interceptor would have permanently impacted 3.84 acres of wetlands, however, the Lee Davis pipeline (which runs through a different part of the County) is expected to impact only 30 square feet of wetlands. Hanover County has apparently dropped all plans to construct the Interceptor at any time in the foreseeable future. The Interceptor has been eliminated entirely from the Army Corps application, as well as from Hanover County's Capital Improvement Plan. Plans to construct a pump station necessary for the Interceptor have been abandoned, and the county has ceased its efforts to obtain easements necessary to construct the Interceptor.

The Army Corps assigned new staff with no previous involvement in the project to review the County's revised application. The Corps initially planned to process the application through the individual permit process rather than through the NWP verification process, and informed both the County and the Court of this intention. It determined that the revised application included all "reasonably related" activities, as required for individual permit applications by 33 C.F.R. § 325.1(d)(2), and it issued a public notice soliciting comments about the possible issuance of an individual permit. Over the next several months, continuing to act in accordance with the individual permitting procedure, the Corps received public comment, conducted several field visits, solicited feedback from other federal and state regulatory agencies, and continued to analyze whether the project as submitted represented another effort to improperly segment a larger project so as to avoid full environmental review. As the district court observed, none of this was necessary for verification under the NWP program.

Numerous state and federal agencies commented on the project, collectively concluding that the proposed construction would have no adverse impact on the environment, water quality, recreational facilities, scenic beauty, or historic resources of Virginia. The Virginia Department of Health advised the Corps that the water from the discharge pipe would actually be cleaner than the water in the Pamunkey River, and that the treatment plant and discharge structure were "where [they] ought to be."

Plaintiffs maintained their objections to the project, however, charging that the application did not include all of the construction

necessary for the project and therefore did not disclose all of the reasonably related activities planned by the County. Much of the dispute over this issue has focused on the volume of sewage that the project would process. Plaintiffs contended that, notwithstanding the capacity of the treatment plant itself, the new sewage associated by the County's rapid growth would be generated principally in areas not serviced by the Lee Davis pipeline. They therefore argued that the revised proposal would not substantially assist Hanover County in remaining under the cap of its wastewater processing contract with Henrico County.

Plaintiffs also pointed to a separate application by a private developer for a permit to extend a sewer line in connection with the intended construction of a multiuse development at Bell Creek. Plaintiffs argued that this private sewer line should have been included as part of the County's application. When the plans for the Bell Creek development had first been proposed to Hanover County, the private developer had assumed that the development's sewer lines would connect to the Interceptor. Since the Interceptor was not approved, however, the developer was forced to submit plans for extension of its sewer line to another spot in the county system. Plaintiffs noted that 2,200 feet of this 7,500-foot sewer line is slated to run along the 5.6-mile path of the formerly proposed Interceptor. After the sewer line is complete, it will be dedicated as a public sewer main and — if the wastewater treatment plant is completed — divert sewage from the Bell Creek development to the new wastewater treatment plant.

After reviewing these various contentions, the Corps determined that all activities reasonably related to the project had been fully disclosed, and that the application presented a single and complete project. The Corps investigated plaintiffs' claim that the abandoned Interceptor would be built and found that their concerns were not credible. The Corps also concluded that the Bell Creek sewer extension could not properly be considered part of the wastewater treatment plant project. The Corps concluded that the sewer extension could not serve the function of the original Interceptor, in large part because the Bell Creek sewer extension is sized to serve the Bell Creek development and will have only forty percent of the capacity that the Interceptor would have had. The Corps further concluded that the revised project's impact on wetlands would be "minimal, both

individually and cumulatively." It also found that the discharge of treated wastewater into the Pamunkey River would not damage the water quality in that river.

Based on these findings, the Corps verified four NWPs for the construction of Hanover County's revised wastewater treatment plant project in April 2002. The decision was accompanied by a 47-page memorandum and an administrative record of roughly 6,000 pages.

Plaintiffs appealed the new NWP verifications to the district court. They alleged that the revised application did not include all of the "reasonably related" means by which the County would deliver sewage to the proposed plant in the future. They argued that if the Corps had considered other, properly related infrastructure plans, the environmental impact of the proposal would have been far greater, requiring evaluation of the application through the individual permit process.

The district court applied rigorous scrutiny to the Army Corps' decision and held that the present project was not "single and complete." 214 F. Supp. 2d at 651-52. The court held that the purpose of Hanover County's project was to "off-load[ ] enough sewage to allow it to remain within the 5.4 mgd limit of its contract with Henrico [County]." *Id.* at 629. The court then engaged in an independent mathematical calculation of projected wastewater flows and determined that the proposed project was unlikely to enable Hanover County to stay within the contractual limits after 2005. *Id.* at 626 & nn.42-43, 629-31. The court therefore decided that other potential projects would have to come online to achieve the project's purpose, and that those projects should have been included in the Corps' analysis. *Id.* at 635-37. The court also held that there was strong evidence that the Bell Creek sewer was reasonably related to the revised project and should also have been included in the Corps' analysis. *Id.* at 632-35. Finally, the court held that the Corps had erred procedurally by abandoning the individual permit process and authorizing the project under the NWP program instead. *Id.* at 638. For all these reasons, the court concluded that the Corps' decision was arbitrary and capricious, set aside the NWP verification, and remanded to the Corps for reconsideration with numerous specific instructions. *Id.* at 654-55. This appeal ensued.

II.

Our review of the district court's decision in this case is de novo as to both law and fact, *Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 61 (4th Cir. 1991), since the district court here stands in no better position than an appellate court in reviewing the administrative record. *MM v. School Dist. of Greenville County*, 303 F.3d 523, 531 (4th Cir. 2002).

Our concern with the district court's decision begins with the standard of review. Under the deferential standard established by the Administrative Procedure Act, federal courts can overturn an administrative agency's decision if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2) (2003). "Although our inquiry into the facts is to be searching and careful, this court is not empowered to substitute its judgment for that of the agency." *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 288 (4th Cir. 1999). Particularly with environmental statutes such as the Clean Water Act, the regulatory framework is exceedingly "complex and requires sophisticated evaluation of complicated data." *Trinity Am. Corp. v. EPA*, 150 F.3d 389, 395 (4th Cir. 1998). We therefore do not "sit as a scientific body" in such cases, "meticulously reviewing all data under a laboratory microscope." *Natural Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1401 (4th Cir. 1993). Rather, if the agency "fully and ably explain[s] its course of inquiry, its analysis, and its reasoning sufficiently enough for us to discern a rational connection between its decision-making process and its ultimate decision," we will let its decision stand. *Trinity Am. Corp*, 150 F.3d at 395 (internal punctuation omitted).

A reviewing court must defer not only to an administrative agency's findings of fact but also to that agency's reasonable interpretations of governing law. If it is apparent that Congress would expect the agency "to speak with the force of law when it addresses ambiguity in [a] statute," a reviewing court must accept the agency's construction of that statute so long as it is "reasonable." *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001); *see generally Chevron U.S.A. Inc. v. Nat'l Res. Def. Council*, 467 U.S. 837, 842-45 (1984). And courts must accept an agency's interpretation of its own regulations unless that interpretation is "plainly erroneous or inconsistent with the

regulation." *Sigma-Tau Pharmaceuticals, Inc. v. Schwetz*, 288 F.3d 141, 146 (4th Cir. 2002) (internal punctuation omitted).

Despite acknowledging the governing caselaw, the district court in this case declined to accord the necessary deference to the Army Corps' decision. Noting that the Corps' initial decision had been overturned as arbitrary and capricious, the district court asserted that the Corps' review of the second project had reached "virtually the same decision after judicial remand." 214 F. Supp. 2d 593, 621 (citing *Natural Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1049 n.23 (D.C. Cir. 1979)). It therefore decided that the Corps' most recent decision should be assessed under "heightened scrutiny" and proceeded to engage in a highly exacting, essentially de novo examination of the record, repeatedly rejecting the Corps' conclusions and drawing its own independent inferences from the evidence. *Id.*

This was an erroneous approach that turned the Administrative Procedure Act on its head. In the first place, it is not true that the Corps reached virtually the same decision after the judicial remand. The County presented a substantially new proposal, eliminating the only problematic element from the prior proposal (the Interceptor) and replacing it with a completely different structure (the Lee Davis pipeline) located in a different part of the County. And whatever the district court thought of the Corps' reasoning process during its evaluation of the original proposal, it is uncontested that the Corps assigned new staff with no previous connection to the project to review the revised proposal.

The Corps' dedication to a credible decisionmaking process on remand was clear: it devoted more than five months to reviewing the application, engaged in an extensive and ongoing dialogue with the County, considered comments from at least eight other federal and state environmental and health agencies, and generated an administrative record of more than 6,000 pages. The district court thus erred initially by failing to accord the proper statutory deference to the Corps' decision.

### III.

Plaintiffs' first major challenge to the Corps' decision is procedural. They argue that, because the Corps initially treated the Coun-

ty's proposal as an application for an individual permit, it was improper for the Corps to subsequently issue an NWP verification in place of an individual permit.

The district court pointed out, quite correctly, that the Corps began its evaluation of the revised application in accordance with the regulations applicable to individual permits. *Id.* at 638-39. But this did not render the Corps' eventual decision to approve the proposed project via NWP verification rather than an individual permit any less consistent with the Corps' mandate. The governing regulations specifically require the Corps to "review *all* incoming applications for individual permits for possible eligibility under . . . NWPs." 33 C.F.R. § 330.1(f) (2003) (emphasis added). If any proposed activity "complies with the terms and conditions of one or more NWP," the Corps "should verify the authorization and so notify the applicant," even if the applicant never sought review under the easier approval process. *Id.* In fact, if an application for an individual permit is even close to qualifying for an NWP, the regulation goes so far as to require the Corps to alert applicants to that fact and explain to them how they could modify the project to make it eligible for NWP verification. *Id.* The Corps' review of the County's application for eligibility under the NWP program was thus an essential part of the ordinary individual permit process. The Corps did no more by verifying the NWPs than what its regulations required it to do.

The district court held that § 330.1(f) could not justify the Corps' decision to switch to the NWP verification process because the Corps did not specifically cite to that regulation in its decision document. 214 F. Supp. 2d at 643 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (holding that the propriety of agency actions must be judged "solely by the grounds invoked by the agency," and that a reviewing court cannot affirm an agency's action "by substituting what it considers to be a more adequate or proper basis")). The district court therefore refused to accept what it termed a "classic post-hoc rationalization" for the agency's action. *Id.* at 645.

This characterization of § 330.1(f), however, misunderstands the nature of that regulation. "We are dealing here not with the reasoning by which an agency seeks to justify its actions, but with a pure question of law." *Indep. U.S. Tanker Owners Committee v. Skinner*, 884

F.2d 587, 591 (D.C. Cir. 1989). The question is simply whether that regulation requires the Corps — as it did here — to review all incoming applications for NWP eligibility. *Cf. id.* (rejecting "post hoc rationalization" argument which was based on an agency's failure to cite regulatory authority in its final decision). As explained above, there is no question that the regulation does so require. Indeed, the County properly points out that it is actually *entitled* to the mandatory NWP screening under § 330.1(f); even if it were so inclined, the Corps could scarcely withhold the benefits of that regulation from the County by the simple expedient of failing to cite to it. As a matter of law, then, the Corps simply acted in direct compliance with its governing regulations.

The district court held in the alternative that § 330.1(f) cannot support the Corps' decision because the Corps did not put interested parties on proper notice of the potential NWP verification. The court acknowledged that "notice and comment ordinarily is unnecessary where the Corps determines that a project may proceed under the authority of NWPs," and also that "no precise regulation mandates that the Corps must notify interested parties of a decision to switch from the individual permitting mode to the NWP mode." 214 F. Supp. 2d at 644 n.57. But the court argued that it was "unfair" for the Corps to mislead plaintiffs into believing that the County's application would be reviewed under the individual permitting process, because the Corps had realized early on that the revised proposal might qualify for an NWP verification. *Id.* at 644-45.

Once again, however, the district court failed to acknowledge the nature of the procedures for reviewing an individual permit application. As noted above, the normal individual permitting process *requires* evaluation of any permit application for eligibility under an NWP. 33 C.F.R. § 330.1(f) (2003). Plaintiffs were thus already on notice that application assessment under the individual permit framework *necessarily* included review for potential NWP eligibility. There can be nothing "unfair," misleading, or secretive about the Corps proceeding in precise accordance with its openly promulgated regulations.

Plaintiffs further contend that § 330.1(f) does not apply because the revised proposal was not an "incoming application" within the regula-

tory meaning of that term when the Corps decided to verify its eligibility for NWPs. They observe that automatic NWP eligibility review applies only to "incoming applications for individual permits." *Id.* They further note that under § 330.1(f), if a District Engineer notifies an applicant of project modifications which could render his proposal eligible for an NWP, the Engineer should nonetheless "proceed with processing the application as an individual permit and take the appropriate action within 15 calendar days of receipt, in accordance with 33 C.F.R. § 325.2(a)(2), unless the applicant indicates that he will accept the modifications or conditions." *Id.* Plaintiffs therefore argue that, in context, an "incoming application" must be understood as an application which arrived no more than fifteen days before the § 330.1(f) decision. Thus, because the Corps verified NWP eligibility in this case after that fifteen-day period had expired, plaintiffs argue that the NWP verification cannot be justified under § 330.1(f).

Plaintiffs' construction of the regulation's text is strained, to say the least. Section 330.1(f) simply does not establish a deadline for the Corps's decision to approve an individual permit application under an NWP. "Incoming application," a phrase not defined elsewhere in the regulations, is most naturally read as another way of referring to any application that has been received by the Corps. And the fifteen-day period referenced by plaintiffs is simply and solely a time frame for taking "appropriate action . . . *in accordance with 33 C.F.R. § 325.2(a)(2)." Id.* (emphasis added). Section 325.2(a)(2) is the regulation requiring the District Engineer to determine within fifteen days of receiving a permit application whether the application is complete, and then to issue public notice of the pending review if it is. The quoted section of § 330.1(f) thus does no more than admonish the Corps, even if it is considering verifying an NWP for a proposed project that is in the individual permitting process, not to delay in fulfilling its existing obligations under § 325.2(a)(2). The language certainly does not establish a deadline for sua sponte NWP verification. It would simply confound common sense to assume that § 330.1(f) requires the Corps to decide immediately and irrevocably — at the very outset of the lengthy individual permit application process, and regardless of the size and complexity of the construction project — whether a proposed project is eligible for one of the Corps' many NWPs.

We therefore hold that the procedures followed by the Corps in its review of Hanover County's permit application were lawful.[1]

IV.

Plaintiffs' other principal challenge to the Corps' NWP decision goes to the substance of the County's application itself. Even if the Corps is generally allowed to switch from individual permitting to the NWP verification process in circumstances such as these, plaintiffs contend, the County's revised proposal should not have been verified as eligible for multiple NWPs because it was not a "single and complete project."[2]

In order to qualify for approval under the NWPs at issue in this case, a proposal must constitute a "single and complete project." 33 C.F.R. § 330.6(c) (2003). This means that the proposal must represent "the total project proposed or accomplished by one owner/developer or partnership or other association of owners/developers." 33 C.F.R. § 330.2(i) (2003). The test governing this inquiry is whether the project has "independent utility" — or in other words, whether it "would

---

[1]In view of the foregoing discussion, we have no need to take up appellants' argument that the Corps' discretionary authority under 33 C.F.R. § 330.4(e)(3) also justified its verification of the revised project's eligibility for an NWP.

[2]Plaintiffs also contend that the County's application for an individual permit should have been rejected as incomplete before it ever got to the stage of automatic NWP eligibility review, because the application failed to include all activities that were "reasonably related" to the proposed project. *See* 33 C.F.R. § 325.1(d)(2) (2003). While the parties disagree about whether this requirement even applies to a case where the proposal was ultimately approved under the NWP program and not under an individual permit, we need not resolve that dispute now. The Corps and the District Court both assumed — and none of the parties have contested — that these two standards (the "reasonably related activities" standard for individual permits and the "single and complete project" standard for verifications under multiple NWPs) require essentially the same thing. 214 F. Supp. 2d at 646-48. At least in this case, then, for the same reasons that the County's application passes muster under the "single and complete project" standard, it also satisfies the "reasonably related activities" requirement of § 325.1(d)(2).

be constructed absent the construction of other projects in the project area." 67 Fed. Reg. 2020-01, 2094 (Jan. 15, 2002). As the district court noted, this ensures that the Corps has complete information about the full dimension and reach of a project so that it can make an informed decision about the project's cumulative effect on wetlands. 214 F. Supp. 2d at 648. This in turn prevents applicants from circumventing review of a project which would have more than minimal environmental impact by breaking it up into several smaller proposals, each of which would have sufficiently minimal impact to qualify for NWP verification.

Plaintiffs contend that a "fundamental purpose" of the revised project is to enable the County to avoid exceeding the 5.4 mgd limitation on its sewage treatment contract with Henrico County. They then argue that the project as currently proposed will be unable to stave off that eventuality for more than a few years, and that it therefore necessarily contemplates further related additions in the near future. Despite the fact that the Lee Davis pipeline's initial peak flow capacity is 2.6 mgd and could easily be raised to 7.1 mgd, plaintiffs contend that the Lee Davis pipeline will never actually offload significantly more than 0.8 mgd of wastewater (the amount projected for the first year of the pipeline's operation) from Henrico County's processing facilities. They ground this conclusion on an assertion that the County has not specifically demonstrated that the area served by the pipeline will ever generate significantly more sewage than that first-year figure. If plaintiffs' contentions are correct, the great majority of excess sewage will be generated in areas not serviced by the Lee Davis pipeline and therefore inaccessible to the new wastewater treatment plant. Relying on this assumption, plaintiffs assert that the amount of wastewater treated by Henrico would be at its contractual cap of 5.4 mgd by 2007.

The basic problem with plaintiffs' argument is that it seeks to override and redefine the stated purpose of the County's project. As explained in the Corps' decision document, that purpose is very broad: "to provide additional wastewater treatment capacity so that the County may implement [its] adopted comprehensive plan for 'Smart Growth', limiting high density, suburban-style growth to a small portion of the County (20%) and preserving the rural character of the remainder of the county." Despite this clear language, plaintiffs

and the district court erroneously treated the project as though it were targeted at a far narrower goal: staying within the contractual cap of the agreement with Henrico County without making any other future improvements. Contrary to plaintiffs' assertions, however, the Corps was justified in concluding that the project could independently accomplish its stated goal. The County has chosen to create an enormous new source of capacity for wastewater treatment so as to allow for population growth and maximize flexibility for infrastructure planning in the future. Simultaneously, it has enacted medium-term plans to utilize a portion of that new capacity by channeling sewage through the Lee Davis pipeline. Plaintiffs do not deny that both of these purposes will be fulfilled by the revised project.

There is no doubt that other conveyance mechanisms will eventually be needed in order to take full advantage of the treatment plant's capacity. Indeed, some of them have already been tentatively sketched out. But it is simply not possible for the County to predict precisely when, where, and how those sewer lines will actually be constructed. Municipal plans for the location and construction of sewer lines involve so many variables that virtually the only sure thing about them is that they will change. Growth in a county as a whole slows and accelerates. The distribution of growth within the county shifts and fluctuates. State and federal regulatory frameworks change. For all these reasons, the Clean Water Act does not require counties to set in stone their infrastructure plans for the next fifty years. Rather, the question with any given application is whether the proposed project is reasonably defined to include all of its definitely planned, concretely identifiable elements. And the presumptive arbiter of the point at which speculative or inchoate plans become sufficiently foreseeable to require inclusion in an NWP verification request is the Army Corps of Engineers, not an Article III court.

In fact, even if the revised project were principally intended to keep Hanover County under the Henrico contractual cap for a significant period of time, there was ample evidence to support the Corps' finding that the revised project will do exactly that. To begin with, the district court failed to defer to the Corps' finding that the Lee Davis pipeline will offload wastewater flow "in quantities nearly comparable to the [Interceptor]," which if true would mean that Hanover *would* be able to "remain within its contractual limits . . . for an addi-

tional 7 to 10 years."[3] In rejecting this conclusion, plaintiffs argued that Hanover County had not sufficiently supported its statement that development in the County would occur at a significantly faster rate within the Lee Davis pipeline service area.[4] Plaintiffs therefore assumed that the total amount of wastewater offloaded through the Lee Davis pipeline would be dramatically smaller than the total increase in wastewater production throughout the county. This may be one permissible inference from the evidence. The contrary inference, however, is far from arbitrary or capricious. And the Corps made precisely that contrary inference, concluding that a disproportionate quantity of the new sewage would be accessible to the Lee Davis pipeline.

The district court argued that the Corps' finding on this score relied

---

[3]It is important to note that these calculations did not rely on the presence of the Bell Creek sewer line. There was sufficient evidence in the record to support the Corps' conclusion that the Bell Creek sewer is properly understood, not as a piece of the County's revised proposal, but as an integral element of a separate, self-contained unit — the housing development and its appurtenant infrastructure. The anti-segmentation principle does not require the aggregation of a series of independent projects simply because they may have some points of common contact. *Cf. Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1139-44 (5th Cir. 1992) (discussing segmentation and independent utility principles in context of National Environmental Policy Act); *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 68-70 (D.C. Cir. 1987) (same). The Bell Creek sewer is certainly not, as plaintiffs contend, a tacit replacement for the original Totopotomoy Creek Interceptor. The Bell Creek sewer will stretch over only 0.42 miles of the originally proposed 5.6-mile Interceptor, and it will have scarcely forty percent of the Interceptor's capacity.

[4]We note but do not address the County's contention that the reason it did not further flesh out its findings in this area was because of the extensive attention it paid to a vast array of other issues raised by both the Corps and plaintiffs. It appears that the first time plaintiffs presented their calculations regarding insufficient wastewater flow through the Lee Davis pipeline was during proceedings before the district court. *See Vt. Yankee Nuclear Power Corp. v. Nat'l Res. Def. Council, Inc.*, 435 U.S. 519, 553-54 (1978) (objections must be lodged before administrative agencies with reasonable specificity).

entirely on information provided to them by the County. 214 F. Supp. 2d at 631. Along with plaintiffs, the district court contended that the Corps had a responsibility to independently investigate whether enough of Henrico County's new wastewater would be generated in the Lee Davis pipeline service area to keep the burden on Henrico County beneath the contractual cap for a substantial period of time. *Id.* Precedent does not support the district court's position. *See Friends of the Earth v. Hintz*, 800 F.2d 822, 834-36 (9th Cir. 1986) ("The Corps is not a business consulting firm" and may therefore base its analysis "entirely upon information supplied by the applicant."). For us to require the Corps to do such independent studies rather than reasonably relying on extensive studies given to them by applicants "would place unreasonable and unsuitable responsibilities on the Corps," which receives thousands of permit applications per year. *Id.* at 835-36. The Corps was therefore justified in relying on a County study which concluded that a "large amount of the development that is projected to occur in the immediate future in Hanover will be served by [the Lee Davis] pump station." This finding in turn provided ample support for the conclusion that the Lee Davis pipeline would draw a sufficient proportion of the incremental sewage production to keep Hanover County within its contractual limit for a substantial period of time.

There was also evidence that plaintiffs' prediction of excessive sewage processing demand was inaccurate because of a mathematical error: the failure to use comparable figures in a comparative calculation. Plaintiffs projected aggregate county sewage production based on the volume of wastewater flow generated by the county in a year of wet weather. But they projected wastewater flow through the Lee Davis pipeline based on the volume generated from that part of the county during a drought year. Unsurprisingly, there was evidence that this apples and oranges comparison yielded a dramatic understatement of the relative capacity of the Lee Davis pipeline to offload sewage flow from Henrico County's processing plant. Indeed, the district court acknowledged that the County's calculations suggested that the revised project — standing alone — would keep Hanover County within its contractual cap for at least ten and possibly as many as seventeen years. 214 F. Supp. 2d at 630. Proper respect for the Corps' decisionmaking process required deference to what the district court

itself recognized as reasonable calculations supporting the Corps' decision.[5]

We therefore hold that it was neither arbitrary nor capricious for the Corps to decide that Hanover County's revised proposal was a single and complete project. We reverse the district court and reinstate the Corps' verification of the proposal's eligibility for NWP approval.

V.

In the final analysis, plaintiffs' effort to use environmental regulations to thwart the County's wastewater management efforts is misguided, not only under the letter of those regulations, but in light of their spirit as well. Every state and federal agency that reviewed this application either commented favorably on the revised proposal or noted no objection to it after further study. No private environmental group has intervened in an effort to stop or modify the County's plans. And there is ample evidence to suggest that Hanover County's proposal is an environmentally sound project that promises to benefit the County in the long run. The proposed project will treat and eliminate septic wastewater, thus managing what could otherwise present a significant health risk. Equally important, the treatment plant and supporting infrastructure is intended to play a critical role in Hanover County's environment-friendly "Smart Growth" policy. County planners proposed this project in the first place to enable the construction of concentrated development tracts (which require sewers rather than septic systems), and thereby to help minimize the footprint of housing developments and preserve a significant portion of the County in a pristine and rural state. Evidence available to the Corps thus suggested that, far from endangering Hanover County's natural environ-

---

[5]The district court argued that the paper record from the Corps' administrative review did not explicitly include independent calculations made by the Corps itself. Critically, however, the administrative record *does* include the figures on which those conclusions were based. This suffices to demonstrate a "rational connection between [the Corps'] decision-making process and its ultimate decision." *Trinity Am. Corp*, 150 F.3d at 395 (internal punctuation omitted).

ment, the wastewater treatment plant showed every likelihood of helping to protect it.

We reverse the district court's order and remand the case to the district court with directions to enter judgment for the defendants.

*REVERSED*