MARYLAND NATIVE PLANT
SOCIETY, et al.
Plaintiffs

v.

U.S. ARMY CORPS OF ENGINEERS
Defendant

No. CIV.A. PJM 03–2965.

United States District Court,
D. Maryland.

July 23, 2004.

Benjamin Jeremy Woolery, Esquire, Bowie, Hope Madeline Babcock, Esquire, Lisa Beth Goldman, Esquire, Washington, D.C., for Plaintiffs.

David Jay Kaplan, Esquire, Washington, D.C., John C Fredrickson, Esquire, Greenbelt, for Defendants.

## OPINION

MESSITTE, District Judge.

### I.

The Maryland Native Plant Society, the Maryland Alliance for Greenway Improvement and Conservation and several indi-

vidual plaintiffs[1] have sued the U.S. Army Corps of Engineers ("Corps"), the U.S. Environmental Protection Agency and a number of federal government officials in their official capacity.[2] Plaintiffs challenge a determination of the Corps that the construction of one of the two planned housing developments in Charles County, Maryland, involving the dredging and/or filling of wetlands, is authorized under a general discharge permit the Corps issued to the State of Maryland.[3] The developer which sought the Corps' approval, Hunters Brooke, LLC, has been granted Intervenor status. The parties have filed cross Motions for Summary Judgment. Having reviewed the pleadings and heard counsels' oral arguments, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment insofar as it seeks remand of the case to the Corps so that it may further explicate the reasons for its decision. The Court **DENIES** Plaintiffs' Motion insofar as it asks the Court to vacate the Corps' decision or to enjoin construction at this time. The Corps' Motion for Summary Judgment as well as that of Hunters Brooke, LLC are **DENIED WITHOUT PREJUDICE.**

## II.

A brief discussion of the statutory and regulatory background will provide an introduction to the Court's analysis:

### A. The Clean Water Act:

■ The Clean Water Act (CWA), 33 U.S.C. § 1251 et seq., is designed "to re-store and maintain the chemical, physical and biological integrity of the Nation's water." 33 U.S.C. § 1251(a). Section 404 of the CWA regulates the discharge of dredged or fill material into waters of the United States, including wetlands. 33 U.S.C. § 1344. The CWA gives the U.S. Army Corps of Engineers jurisdiction over activities involving such discharges. Pursuant to § 404, the Corps is empowered to issue individual permits for these discharges under § 404(a), or it may issue general permits for them on a nation-wide, regional or state-wide basis under § 404(e). General permits are used to authorize certain categories of discharge activities when they are similar in nature and will cause only minimal adverse environmental effects, individually and cumulatively. 33 U.S.C. § 1344(e). Once a general permit has been issued, individual activities falling within the categories of activities in the general permit may be authorized (or "verified") under that permit, again so long as their adverse environmental impacts do not exceed minimal levels and so long as they meet the additional restrictions contained in the permit. Id.; 33 C.F.R. § 325.2(e)(2). If an activity does not qualify for authorization under a general permit, the Corps must evaluate it under the individual permit process under § 404(a), the corresponding regulations of which impose a host of additional requirements on the agency.[4] 33 C.F.R. § 325.2.

1. The individual plaintiffs are: John Stamper, Patricia Stamper, Ellen Cline, David Boswell, Agnes Warren and George Grieninger.

2. The federal government officials are: Les Brownlee, Acting Secretary of the Army; Robert B. Flowers, Lt. General, Chief, U.S. Army Corps of Engineers; and Marianne Lamont Horinko, Acting Administrator, Environmental Protection Agency.

3. As discussed, infra, construction of the housing development required approval by the Corps due to its planned discharge into wetlands. See 33 U.S.C. § 1311(a) (requiring a permit under the Clean Water Act to allow certain discharges into the waters of the United States).

4. The individual permit process is an intensive, individualized application process and review procedure requiring the Corps to authorize and issue an individual CWA permit prior to construction. In contrast, under a general permit, a developer does not require

The Corps has issued a general permit for the State of Maryland, MDSPGP-2,[5] which authorizes three categories of discharge activities within the State having "minimal individual and cumulative adverse environmental effects." Category I activities require no application or review by the Corps, although those requiring public notice under State law are given such by the Maryland Department of the Environment (MDE). Fill activities authorized under Category I are subject to a maximum wetland impact limit of 5,000 square feet. Category II activities require an application and review by the Corps to ensure that they comply with the terms of MDSPGP-2. *Id.* Category III is reserved for those activities that exceed the impact limits and/or terms and conditions of Categories I and II. Category III-B, pursuant to which the Corps authorized the sewer line and road crossing under review in the present case, applies to activities for which a State permit and public notice are required. Activities authorized under this category may not have an impact on more than one acre of wetlands, whether direct, indirect, temporary or permanent. *Id.* In addition, the activities must be part of a single and complete project that includes all attendant features, both temporary and permanent. *Id.*

B. *National Environmental Policy Act:*

■■■ The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, requires every federal agency to take into account the environmental impact of certain proposed actions. *Appalachian Pow-*

er Co. v. Train, 545 F.2d 1351, 1366 (4th Cir.1976). Under NEPA § 102(2)(C), federal agencies must prepare an Environmental Impact Statement (EIS) for any major federal action that significantly affects the quality of the human environment. 42 U.S.C. § 4332(2)(C). The EIS requirement attaches only to major federal actions with significant environmental effects. *Hodges v. Abraham,* 300 F.3d 432, 438 (4th Cir.2002). In order to determine whether the extensive EIS is required, agencies may choose to first prepare an Environmental Assessment (EA), 40 C.F.R. §§ 1501.3 & 1508.9.

As part of or in addition to the EIS/EA requirement, § 102(2)(E) of NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).

NEPA applies to activities authorized by the Corps under the Clean Water Act. *See,* 33 C.F.R. Pt. 325, App. B (describing NEPA implementation procedures for the Corps' regulatory program). Whenever the Corps issues an individual permit for a proposed project under § 404(a), or a general permit for categories of activities under § 404(e), it must prepare an EIS or EA pursuant to § 102(2)(C) of NEPA. *See* 33 C.F.R. § 325.2(a)(4) ("A decision on a permit application will require either an environmental assessment or an environmental impact statement unless it is included within a categorical exclusion."). The Corps says that, once a general per-

___

pre-construction authorization to proceed and may simply notify the Corps of its construction plans, although it assumes the risk that the project may subsequently be found not in compliance with the general permit. *See, e.g. Crutchfield v. County of Hanover,* 325 F.3d 211, 219–224 (4th Cir.2003).

**5.** "MDSPGP-2" stands for "Maryland State Programmatic General Permit 2," which is the second general permit issued for the State of Maryland. The first permit was limited to five years, as provided by 33 U.S.C. § 1344(e)(2), and upon expiry was replaced by MDSPGP-2.

mit is in place, when it authorizes an activity under the permit, it prepares no EIS or EA because, by definition, activities under the general permit only have minimal adverse environmental effects. *See* 33 U.S.C. § 1344(e). These, says the Corps, are subject to a categorical exclusion under 33 C.F.R. § 325.2(a)(4) and 40 C.F.R. § 1508.4. *See* 40 C.F.R. § 1508.4 (defining "categorical exclusion" as "a category of actions which do not individually or cumulatively have a significant effect on the human environment" for which neither an EA or an EIS required).

It is not entirely clear whether the Corps is obliged to conduct an alternatives analysis per 4223(e) where an EIS or EA is not required. Plaintiffs contend that the Corps must do so and that it should have done so here (it did not) with respect to the activities at issue. The Corps maintains that it fulfills its NEPA obligations when it issues a general permit and thereafter has no obligation to do an alternatives analysis. The Court will return to this matter presently.

### III.

Araby Bog comprises nearly seven acres of wetlands in southern Charles County, Maryland, in woods south of Indian Head, near Mattawoman Creek and Route 225.[6] According to Plaintiffs, it is one of the largest, most pristine examples of a magnolia bog not only in the region, but in the world.[7] They submit that the Bog is an undisturbed habitat in Maryland for at least one state threatened and many state rare plant species, and that it contains practically no non-native invasive plants. The continued survival of the Bog, say Plaintiffs, depends on its protection and the maintenance of a number of ecological conditions, including its groundwater supply and acidity.

In March 1998, an engineering consulting firm known as ATCS, PLC filed two permit applications with the Corps and Maryland's Department of the Environment, which would occasion the filling, grading and deforesting of more than 50,-000 square feet of nontidal wetlands and wetlands buffer. These filings had implications for the Bog. Specifically, the developers proposed to build two unified residential cluster subdivisions, denominated Hunters Brooke and Falcon Ridge. Plans indicated that the Hunters Brooke development would extend to within 100 feet of the Bog, while Falcon Ridge would encompass the Bog itself. Because a sewer line (for both Hunters Brooke and Falcon Ridge) and a road crossing (for Hunters Brooke alone) would require the grading and filling of wetlands, the developers sought a dredge and fill permit from the Corps under § 404 of the CWA, 33 U.S.C. § 1344.

In compliance with its statutory mandate, the Corps notified federal, state and local agencies as well as interested citizens, soliciting their comments. Plaintiffs—two local environmental groups and several owners of land adjacent to the

6. The Corps disputes that Araby Bog actually qualifies as a bog. All parties concede, however, that it is a wetland within the Corps' jurisdiction, hence the Court need not decide whether it is, in fact, a bog. For the sake of consistency, the Court will occasionally refer to the wetland as a bog, as the Corps did in the administrative record and as it has in its pleadings before the Court.

7. Magnolia bogs are enlarged springs or seeps that occur in terrace gravel deposits, making them distinct from the peat bogs of New England and northern Europe. Found in a limited range in the Washington, D.C. area, they are characterized by acidic soil and water and contain numerous native plant species whose survival hinges on the bogs' unique ecological conditions.

Bog—became early and vocal opponents of the project. During the public review of the dredge and fill application, they submitted reports of numerous ecologists, botanists, geologists and other professionals, warning of the serious adverse effects that Hunters Brooke and Falcon Ridge would inflict on the Bog, both individually and collectively. These experts warned that the mitigation conditions proposed by the Corps in its general permit would be insufficient to protect the Bog from the harmful effects of either or both developments.

The Corps spent some five years reviewing the permit application, generating an administrative record of approximately 4,500 pages. In January 2003, notwithstanding the evidence adduced by Plaintiffs and presumably relying on evidence adduced by others, the Corps decided to authorize the sewer line that would serve Hunters Brooke and Falcon Ridge and the road crossing for Hunters Brooke pursuant to Maryland's general permit, MDSPGP–2. The Corps's formal authorization decision took the form of a letter from the District Director of the Corps, Walter Washington, Jr.,[8] to the developer, Hunters Brooke, LLC, which stated in pertinent part:

> The U.S. Army Corps of Engineers . . . has determined that the proposed work meets the terms and conditions of the [MDSPGP–2], as a Category III–B activity, provided the work described below, is completed in compliance with the plan(s), the standard MDSPGP–2 conditions, and the applicable MDSPGP–2 activity-specific conditions, which are all enclosed as part of the [MDE] and Corps authorization package . . .

*See Letter from Walter Washington, Jr., Chief, Maryland Section Southern, to Jim Whitehead of January 28, 2003,* Admin. R. at 20050. The letter also contained several project-specific conditions agreed to by the developer and Charles County, which the Owner was required to follow "within the Subject Wetland or its drainage area," in order to "minimize indirect impacts on the Araby Bog."[9] *Id.* at 20051.

---

8. Washington is otherwise identified as "Chief, Maryland Section Southern" of the Corps.

9. Those conditions were as follows:

 a. 100–foot buffer to the degree feasible around the non-tidal wetlands identified by [MDE] as being dominated by Sweet Bay Magnolias and populated by a State endangered species in the subject wetland.

 b. Structures, including utility lines, shall not be constructed upon the subject wetlands or the buffers protecting the subject wetlands.

 c. Engineered plans supporting the application for Development Services Permit from the County shall delineate the drainage area providing surface and groundwater flow to the subject wetlands, and identify the source of the information determining the delineation.

 d. Stormwater management facilities within the drainage area providing surface and groundwater flow to the subject wetland shall be designed using the new MDE storm water management regulations, adopted October 2, 2000.

 e. Storm water management facilities shall not be designed to discharge untreated storm water directly into the subject wetlands or associated buffers.

 f. Storm water management facilities within the drainage area providing surface and groundwater flow to the subject wetland shall be designed to recharge groundwater through infiltration, to the maximum extent feasible, as demonstrated through the County's Development Service Permit process. Low impact methods of directing hydrologic flow to the wetlands and bog area through infiltration, particularly in the area of development closest to the wetlands, shall be demonstrated as preferred design alternative. Low impact design alternatives to be considered shall include rain gardens, elimination of curb and gutter construction in favor of roadside grasscovered swales, shared driveways, location of building toward the front of lots while retaining forest to the rear of lots, and se-

Apart from the language authorizing the developer to proceed under the general permit and its reference to the project-specific conditions, the letter gave no reasons for the Corps' decision, nor did it discuss how or why approval pursuant to the general permit was appropriate.[10]

## IV.

### A.

Plaintiffs argue that the Corps' decision was arbitrary and capricious. They dispute that the Hunters Brooke project individually or in tandem with Falcon Ridge will have a minimal adverse impact on the

quential grading to avoid creation of large cleared areas devoid of vegetative cover.

g. Within the subject wetland drainage area, steep slopes in excess of 25% shall not be disturbed, unless disturbance for the purposes of access cannot be avoided.

h. Construction practices shall direct storm water toward locations other than the subject wetlands, preventing potential sedimentation within the subject wetlands and associated buffers, and sediment controls shall be maintained daily.

i. Covenants shall be placed upon Hunters Brooke Subdivision which require alternative methods of care and maintenance of lawns to reduce runoff of storm water containing nutrients and chemical and which prohibit the planting of strongly invasive species, as approved by the Charles County Planning Director prior to final plat approval within the subject wetland area.

Admin. R. at 20051–52.

In June of 2003, the developer apparently agreed to incorporate additional "best management practices into construction plans for Hunters Brooke." *Id.* Those practices were to:

1. Move the houses forward to the street building restriction line and minimize the useable rear yard areas for lots 33, 34, 35, 36, 37 and 38, as well as adjoining lots, and revise the grading plan to preserve an additional 1.60 acres of trees.

2. Incorporate a new storm drainpipe system to capture a 25,000 square foot drainage area in the vicinity of lots 33 through 38 and convey the water to the original

Bog and, accordingly, are before the Court challenging the decision of the Corps to verify the Hunters Brooke project under general permit MDSPGP–2. They argue that the developer should be required to comply with the more rigorous individual permit process.

Plaintiffs contend that, in violation of the CWA and the Administrative Procedures Act (APA), 5 U.S.C. § 701 *et seq.*, the Corps has given no explanation for its decision to authorize the sewer line and road crossing, nor has it justified its apparent conclusion that the direct, indirect and cumulative adverse environmental effects of the Hunters Brooke and Falcon

drainage area between lots 35 and 36 and into a dry grass swale with pre-treatment device, so that the water can recharge the groundwater system that feeds "Araby Bog."

3. Provide pretreatment volume, water quality volume of 0.0360 acre-feet, and groundwater recharge volume of 0.0080 acre-feet for Phase I of the development within the drainage area of "Araby Bog."

4. Manage impervious surfaces from lots 33, 34, 35, 36, 37 and 38 with the following strategy:

 a. Direct the runoff from the front roofs and driveways of lots 33, 34, 35, 36, 37 and 38 to the grass swale treatment system;

 b. Direct the runoff from the rear roofs of lots 35 and 36 by connecting the roof leaders to the grass swale treatment system; and

 c. Sheet flow the rear roof runoff from lots 33, 34, 37 and 38 to the forested buffer.

5. Remove the sediment trap on Lot 36 and adjust the sediment control plan to utilize "super silt fence" and stone outlet windows. [and]

6. Relocate the hiker-biker trail to the east side of Cabinwood Court.

*See, Letter of Robert Summers to Roy Hancock,* Intervenor's Motion for Summary Judgment, Exh. O.

10. Counsel for the Corps has argued that two other letters also comprise the "decision" of the Corps in this case. These will be discussed, *infra.*

Ridge developments will be minimal, as required for an authorization under MDSPGP–2. Despite the numerous warnings from their experts that without a better understanding of the Bog's complex ecology any adjacent development could destroy the Bog, say Plaintiffs, the Corps conducted no studies, undertook no investigation, and made no effort to independently examine the impacts of either or both developments on the Bog. In fact, in its letter to the developer authorizing the project, the Corps never addressed the expert reports.

Plaintiffs also dispute that the Corps adequately showed Hunters Brooke to be a single and complete project affecting less than one acre of wetlands, both additional requirements for verification under a general permit. They contend that in fact Hunters Brooke and Falcon Ridge constitute a single and complete project, given that the permit applicants, agent/engineers, environmental consultants, legal counsel and principal contacts for both sites were identical. Plaintiffs point out, in addition, that the two developments will share roads, utilities, recreational amenities, and a common development theme and design code. As a result, when the two projects are considered together, the impact on the wetland is well in excess of one acre.[11] Evaluating the impacts of each project separately, therefore, was arbitrary and capricious. In fact, say Plaintiffs, because the entire ecosystem of the 6.5 acres of Araby Bog will be affected by the proposed development, the impact of Hunters Brooke alone exceeds the one acre limit of MDSPGP–2. That, too, makes the Corps' decision arbitrary and capricious.

Plaintiffs further assert that the Corps violated NEPA. They argue that the Corps is obliged to comply with NEPA's requirement under § 102(2)(E) to study "appro-

11. Plaintiffs argue that the Hunters Brooke application states that it will impact 9,800 square feet of wetlands and 3,500 square feet of nontidal wetland buffer. The Falcon Ridge application states that it will impact 22,750 square feet of wetlands and 25,450 square feet of wetland buffer. Accordingly, say Plaintiffs, the total acreage of impact for Hunters Brooks and Falcon Ridge is 61,500 square feet, substantially in excess of one acre (43,560 square feet).

The Corps and Intervenor Hunters Brooke, LLC contend that the proposed construction does not entail significant disturbance of wetland areas—in total, less than one-half an acre. Specifically, they say that the project will require discharge at six locations to allow for sewer line and road crossing installation, for a total of 9,800 square feet of permanent nontidal wetlands impacts, 70 feet of permanent impacts to streams, 200 feet of temporary impacts to streams, and approximately 8,000 square feet of temporary wetlands impacts. According to the Corps and the developer, only discharge sites for Hunters Brooke should be taken into account, not those involving Falcon Ridge or the surrounding buffer.

Defendants continue: Other than the six discharge sites discussed, Araby Bog is not located within the areas to be developed for Hunters Brooke. Rather, the development is located on adjacent non-wetland property, upland to the Bog, all of which is owned by the developer. Although Plaintiffs contend that the Corps may consider the proposed developments as direct or indirect impacts of the six discharge sites, the Corps' maintains that its authority over the project derives from, and is limited to, its authorization of discharges into the waters of the United States.

Finally, say Defendants: The discharge at sites 2 through 6 is necessary to install the sewer line for the development. As represented to the Court at the preliminary injunction hearing, the sewer line has already been installed and the 5 discharge sites associated with it have been completed. Proposed impact site 1 is the road crossing of a stream located in a watershed separate from that containing Araby Bog. The road crossing is not projected to be constructed until November 2004.

priate alternatives" in any case involving unresolved conflicts over alternative use of available resources. Since unresolved conflicts over alternative uses of available resources exist here, the Corps should have examined appropriate alternatives pursuant to NEPA § 102(2)(E), even though an EIS or EA may not have been required. Because the Corps failed to examine any alternative locations for the sewer line or road crossing that might reduce or eliminate their adverse environmental impacts, the Corps failed to comply with an independent alternatives analysis required by NEPA.

Plaintiffs ask that the Corps' authorization of the sewer line and road crossing be set aside until such time as the agency properly complies with the CWA, the APA, and NEPA. They also ask the Court to enjoin the Intervenor from further construction on the Hunters Brooke site until the Corps complies with its legal obligations.

### B.

The Corps denies that its verification decision of Hunters Brooke was arbitrary or capricious and maintains that the project will have no more than a minimal adverse environmental effect. It further contends that it properly proceeded under the general Maryland permit. The reasons for its decision, it argues, can fairly be discerned from the entire administrative record. Moreover, the protective conditions that were included in MDSPGP–2 ensure that any discharges into the less than 0.5 acres of waters of the United States will not have more than minimal adverse environmental impact. The numerous special conditions that have been added to the permit ensure the same result.

■ The Corps defends its decision to assess the environmental impact of Hunters Brooke independently of Falcon Ridge because Falcon Ridge is a separate project which Hunters Brooke does not depend upon for its utility.[12] Finally, the Corps submits that no alternatives analysis under NEPA is required because the Corps already conducted the appropriate NEPA review when it issued the general permit for Maryland.[13]

### V.

■ Plaintiffs' challenge to the Corps' decision is governed by the Administrative Procedures Act (APA), 5 U.S.C. § 701 *et seq.* Under the APA, the standard of review is whether the Corps' decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Crutchfield v. County of Hanover*, 325 F.3d 211, 218 (2003). If the Corps "fully and ably explains its course of inquiry, its analysis, and its reasoning sufficiently" for the court "to discern a rational connection between its decision-making process and its ultimate decision," then the decision of the Corps stands. *Crutchfield*, 325 F.3d at 218, *quoting Trinity Am. Corp. v. EPA*, 150 F.3d 389, 395 (4th Cir.1998) (internal punctuation omitted). That decision need only be rationally based; the court "is not

---

12. For further discussion of the utility test required for a finding of single and complete project, see *infra*, note 17, and accompanying and subsequent text.

13. The Corps also argues that Plaintiffs waived certain arguments due to their failure to assert them during administrative review.

*See Pleasant Valley Hosp., Inc. v. Shalala*, 32 F.3d 67, 70 (4th Cir.1994). The record, however, demonstrates Plaintiffs' active involvement in the administrative review process and their continuous concern with regard to the environmental impact of the proposed development.

to substitute its judgment for that of the agency." *Inova Alexandria Hsp. v. Shalala,* 244 F.3d 342, 350 (4th Cir.2001), *quoting Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The court is confined to the administrative record that the agency had before it at the time it made the contested decision. 5 U.S.C. § 706; *see also Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

The parties in this case agree that it should be resolved on summary judgment; accordingly, they agree that there is no genuine issue of material fact. See Fed. R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The question, then, is whether the Corps' decision to allow the Hunters Brooke project to proceed under a general statewide permit as having minimal adverse environmental impact was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.

## VI.

Minimal Adverse Environmental Impact

Plaintiffs's principal argument is that the Corps failed to provide sufficient reasoning for concluding that the Hunters Brooke project would have minimal adverse environmental impact.

The U.S. Court of Appeals for the Fourth Circuit has held that, under the arbitrary and capricious standard, an agency must clearly justify its decision.

*Crutchfield,* 325 F.3d at 218. The agency must "fully and ably explain[ ] its course of inquiry, its analysis, and its reasoning," demonstrating "a rational connection between its decision-making process and its ultimate decision." *Id.; see also, Clevepak Corp. v. EPA,* 708 F.2d 137, 141 (4th Cir. 1983) (citing *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). An agency's decision will be deemed arbitrary and capricious if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Hughes River Watershed Conservancy v. Johnson,* 165 F.3d 283, 287–88 (4th Cir.1999); *see also, aaiPharma v. Thompson,* 296 F.3d 227, 242 (4th Cir.2002) (The court must "ensure the agency has examined the relevant data and articulated a satisfactory explanation for its action."), *citing Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). In order to facilitate adequate review by the courts, an agency "must provide a written decision that clearly sets out the grounds which form the basis of its action." *Bethlehem Steel Corp. v. EPA,* 638 F.2d 994, 1004 (7th Cir.1980). The agency's decision will not be upheld where the inadequacy of its explanation frustrates judicial review. *Id.*

■ While an agency enjoys broad deference to its expertise, such deference cannot be given if the agency has failed to provide reasoned explanation for its decision. Even under the arbitrary and capricious standard, deference is inappropriate where an agency "does not set forth convincing reasons for its determination in sufficient detail to allow the validity [of its

decision] to be critically examined." *U.S. Lines, Inc. v. Federal Maritime Comm'n*, 584 F.2d 519, 535 (D.C.Cir.1978). In the "absence of such an analysis," a court "cannot defer to the agency's assessment." *Public Citizen v. Dept. of Transp.*, 316 F.3d 1002, 1026 (9th Cir.2003), *cert. granted*, —— U.S. ——, 124 S.Ct. 957, 157 L.Ed.2d 793 (2003).

■ In addition, "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *SEC v. Chenery*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). The APA requires the explanation of decisions to come from the agency during the administrative process—in the words of the Fourth Circuit, "the required explanation must be articulated by the agency at the time of its action." *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 350 (4th Cir.2001); *see also Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (barring agency from relying on affidavits containing "post hoc rationalizations" for its actions that were created during the litigation process); *Appalachian Power Co. v. EPA*, 477 F.2d 495, 507 (4th Cir.1973) ("[F]or a Court to make a critical evaluation of the agency's action and to determine whether it acted perfunctorily or arbitrarily, the agency must in its decision explicate fully its course of inquiry, its analysis and its reasoning.") (inter-

nal citations omitted), *overruled on other grounds, Union Electric Co. v. EPA*, 427 U.S. 246, 254–55, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976).

These propositions present serious problems for the Corps in this proceeding.

■ The first problem the Court encounters is physically locating the Corps' "reasoned" decision. In its Motion for Summary Judgment, the Corps has pointed to numerous exhibits in an effort to justify its decision, including, inter alia, correspondence from various state and local agencies, MDSPGP–2 permit guidelines, the developer's application, various studies submitted to the Corps and transcripts from this Court's earlier proceedings. But in terms of a single unifying document, the Corps offers only the letter from District Director Washington to the developer, dated January 28, 2003.[14] The Corps argues that the special conditions imposed upon the developer, as enumerated in the letter, in effect explain its verification decision. According to counsel, these conditions, together with other parts of the administrative record, including the decisions issued by the State of Maryland and Charles County authorizing the activities, provide an ample basis for the Corps' decision. But as the Court has already observed, the letter merely states in conclusory terms that the proposed work "meets the terms and conditions of the [MDSPGP–2] permit;" it gives no explanation of how or why the Corps reached that

---

14. There is some doubt as to when the decision of the Corps actually issued. Although the Washington letter to the developer and his letter to Plaintiffs' counsel are both dated January 28, 2003, the letter to the developer includes acknowledgment signatures of Permittee, Mohammed Tobah, and another individual, Stephen Eyclesheimer, dated January 22, 2003. Further, the letter to Plaintiffs' counsel appears to be in response to a letter dated August 7, 2002, that Plaintiffs' counsel

sent to Washington, commenting on the Corps' "June 20, 2002, decision letter." The letter from Plaintiffs' counsel questioned the "broad conclusions evident in [the Corps'] June 20, 2002 letter" and made the same arguments Plaintiffs make in the present proceeding. No party has discussed the June 20, 2002 "decision letter" before the Court in this case, and a search of the 6 volumes of the administrative record, which is without an index or table of contents, has not revealed it.

decision in light of the extensive record before it.

Counsel for the Corps points to additional reasons for his agency's decision in a letter dated January 28, 2003, that District Director Washington sent to Plaintiffs' counsel, the Institute for Public Representation, in response to a letter from counsel expressing concerns over the project. In his letter, Washington discusses: 1) the potential effects of Hunters Brooke upon a nearby historic property, 2) the Corps' determination that Hunters Brooke is a single and complete project; and 3) its rationale as to why an EIS under NEPA is unnecessary. But this letter, too, essentially reiterates the special conditions imposed upon the developer, concluding summarily that, "[w]ith respect to the Araby Bog issue, we find that there will be no direct impacts from the Hunters Brooke project on the bog."

A third source evidencing the Corps' rationale for its decision, according to its counsel, is an internal, undated memorandum entitled "CENAB–OP–RMS(1145)" authored by Lloyd C. Gallatin, Jr., whose title is "Environmental Protection Assistant." In this memo, Gallatin reviews the actions the Corps took to investigate the Hunters Brooke development and the arguments raised in opposition to the Corps' decision to verify the project. Yet even this memorandum does little more than assert without reasoning that the project will have no direct impact on the Bog and that the mitigating conditions will be sufficient to protect the Bog from any indirect impact.[15]

Singly or collectively, these documents simply do not measure up. The Court concludes that the Corps has failed to produce the reasoned decision that the law required for its verification of the Hunters Brooke project. The deficiency is partly a matter of form, partly a matter of substance. Form first.

The Court rejects the proposition that it should have to stitch together the Corps' decision from a letter its District Director sent to the developer, a letter the District Director sent to Plaintiffs' counsel, and an internal memorandum from an Environmental Protection Assistant. The Court does not mean to suggest that the Corps has to author a comprehensive decision for every verification decision it makes under a general permit. But it does need to provide a unitary document, identified as the decision of the Corps, which includes at least a semblance of findings of fact and law and a statement of the reasons for the decision. Without that, a district court has no firm ground on which to base its review. It can hardly give deference to the agency's authority and expertise if it cannot find the decision it is supposed to defer to.

As for the letter from District Director Washington to the developer, the Court questions, first of all, whatever the practice may have been heretofore, whether correspondence from the Corps to an interested party is a suitable format for a formal verification decision. An agency's decision, especially one dealing with an issue that required public notice and comment, should be publicly available, not em-

---

15. The memo states:

The District believes that the [conditions imposed] to mitigate indirect impacts on the bog are adequate to protect it. Additionally, there are no direct impacts from the Hunters Brooke project on the bog. . . . Thus, based upon my review and evalua-

tion, including coordination with other Federal, State and local agencies, on the application, I have determined that the proposed project complies with the terms and conditions of the MDSPGP–2 and recommend that authorization be granted.

*Id.* at 6.

bedded in private correspondence between the agency and the interested party. This is true *a fortiori* with respect to District Director Washington's letter responding to a letter of concern from Plaintiffs' counsel. Again, the reasonable supposition is that an agency decision will be a publicly available, self-generated document that reflects the agency's thinking after a review of the total administrative record, not an individualized letter written, once the decision has been made, to one of several citizens or citizen groups who submitted comments when the action was in the proposal stage.

The Gallatin memorandum is especially problematic. Lacking any information as to the identity of its intended recipient, how it was distributed or what authority Gallatin had to speak on behalf of the Corps, the Court has great difficulty relying on this document upon review. In other memoranda brought to the Court's attention, Walter Washington, Jr. signed on behalf of the Corps, as "Chief, Maryland Section Southern." Gallatin signs his memorandum as letter as "Environmental Protection Assistant," with whatever effect that title is meant to convey. The Court is at a loss to know who (including Gallatin) is authorized to speak on behalf of the Corps and upon what basis they do so.

From a substantive standpoint, the Corps' many-leaved decision is no more enlightening. As for the letter from District Director Washington to the developer, it is perhaps possible with considerable exegesis to work back from its reference to the special conditions it imposed to determine why the conditions were put in place, and thus to decipher what the Corps' rationale was for imposing them. But the time for such exegesis is when the administrative process culminates and the agency makes it decision, not when the district court is asked to review the agency's decision.[16] The letter from Washington to Plaintiffs' counsel, while it purports to provide some reasoning for the Corps' decision, still fails to explain how or why the project it has authorized will have minimal adverse environmental impact. To the extent that the Gallatin memorandum addresses the Corps' finding of minimal adverse impact, it appears to be much more a historical recounting of the entire administrative review process than a reasoned decision. Its conclusion is perfunctory: "The District believes that the above iterated measures to mitigate indirect impacts on the bog are adequate to protect it. Additionally, there are no direct impacts from the Hunters Brooke project on the bog. . . . [Thus,] I have determined that the proposed project complies with the terms and conditions off the MDSPGP–2 and recommend that [general permit] authorization be granted." Insofar as these documents are offered as the decision of the Corps, the Court finds them seriously incomplete.

The Court does not mean to suggest that the verification process under a general permit should approximate individual permit review, which would defeat the purpose of the general permit. Nor does the Court ask the Corps to repeat the review process required for the issuance of a general permit each time it verifies a project as appropriate to proceed under that permit. But the Corps, as any federal agency, remains accountable for its decision under the arbitrary and capricious

---

**16.** Counsel for the Corps also cites the general conditions of MDSPGP–2 as supporting its verification decision for the Hunters Brooke project. These provisions, of course, were issued prior to the Corps' analysis of the Hunters Brooke project. Presumably, on remand, the Corps will be able to explain how these pre-existing conditions function so as to limit the impact of the project on the Bog.

standard, and the short of the matter is that the "agency action will not be upheld where inadequacy of explanation frustrates review." *Bethlehem Steel,* 638 F.2d at 1004 (citations omitted). Proceeding under a general permit "is automatic in that if one qualifies, no application is needed before beginning the discharge activity. The Corps has the authority and duty, however, to ensure that parties seeking to proceed under a nationwide permit meet the requirements for such action." *Riverside Irrigation Dist. v. Andrews,* 758 F.2d 508, 511 (10th Cir.1985). To this point in these proceedings, the Corps has not shown that it has done so.

The Corps has repeatedly asserted that the Court's review of its decision should turn on whether the Corps' decisional path "may reasonably be discerned" from the administrative record, citing *Inova Alexandria Hospital v. Shalala,* 244 F.3d 342, 350 (4th Cir.2001). In effect, the Corps invites the Court to review the entire administrative record of this case, comprised of 6 volumes, over 3,000 documents and over 4,500 pages, to discern that decision. However, as stated by the Fourth Circuit in *Inova,* "the agency must provide an *adequate explanation* for its actions, and the explanation must show a *rational connection* between the facts found and the choice made." *Id.* (emphasis added, citations omitted). To require the Court to take on the task of reviewing the entire record in order to discover an adequate explanation for the agency's decision not only presents an undue burden but, as already noted, creates a risk that the Court may rely on evidence that the Corps, the presumable expert in the matter, did not in fact rely upon. *See Crutchfield,* 325 F.3d at 218 ("Although our inquiry into the facts is to be searching and careful, this court is not empowered to substitute its judgment for that of the agency."), *quoting Hughes River Watershed Conservancy v. Johnson,* 165 F.3d 283, 288 (4th Cir.1999). On remand, the Corps must explain more completely how and why the Hunters Brooke project will have minimal adverse environmental impact.

## VII.

## Single and Complete Project & Finding of Less than One Acre Impacted

Plaintiffs have also argued that the Hunters Brooke development does not qualify for approval under MDSPGP–2 because it cannot be shown to be a single and complete project in light of the related Falcon Ridge development, and because the impact of Hunters Brooke, with or without Falcon Ridge, will exceed the general permit's one-acre cap.[17]

17. Both requirements are set forth in the MDSPGP–2:

[D]ischarge must be part of a *single and complete project* that includes all attendant features, both temporary and permanent. The acreage of temporary and permanent impacts to Waters of the United States includes the filled area plus Waters of the United States that are adversely affected by the project through permanent flooding, draining, or mechanized landclearing.

\* \* \* \* \* \*

This activity authorizes work ... that impacts *no more than one acre* of nontidal or tidal Waters of the United States, including wetlands.... The acreage of impact to Waters of the United States includes temporary and permanent impacts, as well as direct and indirect impacts associated with the activity.

MDSPGP–2, p. 69 (emphasis added).

To determine whether this qualified as a single and complete project, the Corps is required to make a finding whether Hunters Brooke has independent utility, as defined in the MDSPGP–2 permit:

> *Independent Utility:* A test to determine what constitutes a single and complete project in the Corps regulatory program. A project is considered to have independent utility if it would be constructed absent the construction of other projects in the project area. Portions of a multi-phase project that depend upon other phases of the project do not have independent utility. Phases that would be constructed even if the other phases are not built can be considered as separate single and complete projects with independent utility.

MDSPGP–2, p. 71; *see also* 33 C.F.R. § 330.6(c)(2003); *Crutchfield,* 325 F.3d at 221. District Director Washington explained the Corps' decision on this issue in his letter to Plaintiffs' counsel dated January 28, 2003:

> We considered both Hunters Brooke and Falcon Ridge subdivisions as individual projects because they have separate owners and each can proceed independently of one another. Hunters Brooke has direct road access and does not require road access through the Fal-

con Ridge development. While the County has required Hunters Brooke and Falcon Ridge to share some common design features, such as water and sewer lines, our position is that this fact does not make the two projects one proposal. The connecting sewer lines into the Falcon Ridge subdivision off the main sewer line will not be constructed by the Hunters Brooke applicant, and therefore, a permit from this office is required for the connecting line and other Falcon Ridge amenities that would impact Waters of the United States before the project proponent can legally proceed with the work. However, from a cumulative impact standpoint, we are certainly aware of the Falcon Ridge proposal and its cumulative effects have been considered in our evaluation of the Hunters Brooke proposal.

*Letter from Walter Washington, Jr. to Inst. for Pub. Representation,* Admin R. at 20011–12.[18]

Although this letter appears to provide a reasoned explanation for the Corps' decision, the Court finds it deficient as a matter of law. As previously observed, the "decision" came in a private letter to Plaintiffs' counsel, one of several commentators on the Corps' proposed decision, and it

---

18. In the CENAB–OP–RMS(1145) memo, *see supra,* Environmental Protection Assistant Gallatin addressed the issue of single and complete project in substantially the same terms:

> The District considered both subdivisions as individual projects because they had separate ownership and each could proceed independently of one another and that we would consider the cumulative effects of the two projects in our analysis of whether the Hunters Brooke project could proceed under the MDSPGP. Furthermore, we were advised that the Falcon Ridge development was on hold by the applicant.... They are separate properties owned by separate entities, and each may proceed independently

of one another. The applicant for Hunters Brooke contends that their project can stand on its own, even if any or all parts of Falcon Ridge were never to be approved by the appropriate governmental authorities, and we do not find any reason to question this view. Hunters Brooke has direct road access and *does* not require road access through the Falcon Ridge development. Although the County has required Hunters Brooke and Falcon Ridge to share some common design features, such as water and sewer lines, it is our position that this fact does not make the two projects one project. *Internal Memo from Lloyd C. Gallatin, Jr.,* p. 2–3.

came after the Corps had already reached its decision.[19] It is not clear whether the letter was made available to the public. The Court holds that the letter cannot constitute any part of the Board's formal decision. Again, lacking certainty that the reasoning discussed in the letter was actually relied upon by the Corps or that the letter's author was authorized to speak for the Corps after the fact, the Court risks running afoul of *Chenery*'s limitations on a reviewing court to "judge the propriety of such action solely by the grounds invoked by the agency." 332 U.S. at 196, 67 S.Ct. 1575.

Plaintiffs' contention that the impacted wetlands will exceed one acre derives, in part, from the Corps' consideration of Hunters Brooke as a single and complete project. They argue, first, that the combined acreage of impacted wetland for Hunters Brooke and Falcon Ridge totals 61,500 square feet, well in excess of the permitted one-acre,[20] and alternatively, that Hunters Brooke alone impacts more than one acre of wetlands because, to the extent that its development indirectly harms the Bog, all 6.5 acres of the Bog will be affected.

Leafing through the three proffered sources of the Corps' reasoned decision, the Court finds but one conclusory statement that relates to the one-acre requirement, *i.e.*, in the letter from the District Director to the Plaintiffs' counsel, in which he states that "[t]he Hunters Brooke project will impact less than an acre of Waters of the United States . . ." This clearly does not suffice. It may be that the Corps intended by its decision that Hunters Brooke is a single and complete project to eliminate Falcon Ridge from its consideration with regard to the one-acre requirement. But it may also be that the Corps inadvertently omitted to consider the *indi-* rect impact Hunters Brooke would have on the Araby Bog as a whole. Again, the Court has no reasoned decision on which to rely. On remand, the Corps will need to make appropriate findings with respect to the single and complete project issue as well as the less than one-acre impacted issue.

## VIII.

### NEPA Alternatives Analysis

Finally, Plaintiffs argue that although the Corps may not be required to do an EIS or EA, it is still required to do the alternatives analysis under NEPA. According to Plaintiffs, this includes suggesting alternatives to the discharge sites as well as alternative locations for the developments altogether. The Corps, as previously indicated, takes the position that its NEPA obligations ended with its issuance of the Maryland general permit.

■ Although the Court has determined to remand this case to the Corps for further elaboration of the rationale for its decision, the Court views this as a legal issue that can be decided at this time. The Court holds that the Corps is not obliged to conduct an alternatives analysis once it has issued a general permit.

Plaintiffs make compelling arguments that the alternatives analysis is required by the terms of NEPA, which does appear to distinguish between such an analysis in connection with "significant" environmental impact cases, 42 U.S.C. § 4332(2)(C)(3), and "any" proposal where there are unresolved conflicts concerning alternative uses of available resources. 42 U.S.C. § 4332(2)(E). Plaintiffs also cite to 40 C.F.R. § 1507.2(d), which states in pertinent part:

---

**19.** See *supra* note 14 and accompanying text.

**20.** An acre equals 43,560 square feet.

Agencies shall: ... (d) Study, develop and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. This requirement of 102(2)(E) extends to all such proposals, not just the more limited scope of sec. 102(20)(C)(iii) where the discussion of alternatives is confined to impact statements.

Responding to the Corps' argument that the NEPA analysis is done at the time the general permit is conducted, Plaintiffs ask how it is possible to do a project-specific alternatives analysis until the specific project is known.

The Code of Federal Regulations and case law, however, appear to support the Corps' view that its responsibilities under NEPA cease once a general permit is issued. *See* 33 C.F.R. § 325.2(e)(2) ("After a regional permit has been issued, individual activities falling within those categories that are authorized by such regional permits do not have to be further authorized by the procedures of this regulation."); *Abenaki Nation of Mississquoi v. Hughes,* 805 F.Supp. 234, 237 (D.Vt.1992); *see also Utah Council, Trout Unlimited v. U.S. Army Corp of Eng'rs,* 187 F.Supp.2d 1334, 1341 (D.Ut.2002); *Defenders of Wildlife v. Ballard,* 73 F.Supp.2d 1094, 1109–11 (D.Ariz.1999). In fact, at least one case suggests that the apparently independent requirement of an alternatives analysis under NEPA actually ties in with the conduct of an EA. *Klickitat County v. Columbia River Gorge Comm'n,* 770 F.Supp. 1419, 1430 (E.D.Wa.1991) ("It appears from these sections that the § 4332(2)(E) mandate to develop alternatives in any proposal which involves unresolved conflicts concerning alternative uses of available resources, is to be discussed as part of the Environmental Assessment."). Be that as it may, the Court is persuaded that the NEPA requirements no longer apply once a general permit has been issued by the Corps. This is consistent with the import of the general permit in the first place—to avoid duplication of effort between federal and other authorities, reduce paperwork and the like. Cf. *Hoosier Envtl. Council, Inc. v. U.S. Army Corps of Eng'rs,* 105 F.Supp.2d 953, 966 (S.D.In. 2000) ("In administering the permit program, the [Corps] seeks to avoid unnecessary regulatory controls. It also strives to reduce paperwork and delays, and believes that state and federal regulatory programs should compliment rather than duplicate one another.") (citations omitted).

The important inquiry insofar as a general permit is concerned is whether the environmental impact of the project which is verified is minimal. If it is, the need for an alternatives analysis, if any, can be left to State and local authorities to determine.

Accordingly, while on remand the Corps must still set forth the rationale for its decision in other indicated respects, it need not conduct an alternatives analysis.

IX.

The Court thus agrees with Plaintiffs that the case should be remanded to the Corps so that it may further explicate its reasons for deciding to allow the Hunters Brook project to proceed under MDSPGP–2; the Court also considers Plaintiffs' request that the Court vacate the Corps' decision in the interim. The Court declines to do so and to that extent Plaintiffs' Motion for Summary Judgment will be denied.

 Where a court determines that a remand is appropriate because an agency's explanation is deficient, remand without vacatur allows the agency an opportunity to respond to the deficiency identified by the court. *See Fla. Power & Light Co.*

*v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."); *see also Checkosky v. SEC,* 23 F.3d 452, 462–66 (D.C.Cir.1994). Remand without vacatur is especially appropriate where the agency is likely to be able to substantiate its decision. *Allied–Signal, Inc. v. U.S. Nuclear Reg. Comm'n,* 988 F.2d 146, 151 (D.C.Cir.1993) (remanding an agency decision for further explication due to "serious possibility that the [agency] will be able to substantiate its decision on remand."). The decision whether or not to vacate depends on the severity of the decision's deficiencies, as well as the disruptive consequences of an interim change. *A.L. Pharma, Inc. v. Shalala,* 62 F.3d 1484, 1492 (D.C.Cir.1995).

▆▆ Given the extensive record involved in this case and the obviously considerable review that has been accomplished by local, state and federal agencies, the Corps may very well be able to justify its decision on remand, once its reasoning stands forth in bold relief. Moreover, vacatur at this juncture would have a serious economic impact on the developer. As attested by Hunters Brooke LLC's general partner, Mohammed Tobah, the partnership stands to lose hundreds of thousands of dollars, if not more, if the uncertainty of a vacatur is introduced, even though the Corps may eventually be able to articulate sustainable reasons for its decision.[21] In view of these considerations, the Court finds that vacatur at this time would be inappropriate. It remains to be seen whether on remand the Corps will be able to correct the noted deficiencies in its decision.

## X.

Summing up: the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Motion for Summary Judgment (Paper No. 29). The Court **GRANTS** the Motion insofar as it **REMANDS** the case to the Army Corps of Engineers so that the Corps may further explicate the reasons for its decision authorizing the sewer line and road crossing at the Hunters Brooke subdivision. The Court **DENIES** the Motion insofar as it seeks vacatur of the Corps' decision or an injunction against further construction at this time. The Motion for Summary Judgment of Defendant Army Corps of Engineers (Paper No. 40), and the Motion for Summary Judgment of Intervenor Hunters Brook, LLC (Paper No. 37) are **DENIED WITHOUT PREJUDICE.**

A separate Order will be entered.

### *ORDER*

In accordance with the foregoing Opinion, it is this 23 rd day of July, 2004, ORDERED:

1. The Motion of Plaintiffs Maryland Native Plant Society et al. [Paper No. 29] for Summary Judgment is GRANTED IN PART and DENIED IN PART;

 A.) The Motion is GRANTED insofar as this case is REMANDED to Defendant U.S. Army Corps of Engineers for a more complete explanation, consistent with the Court's Opinion, of its decision authorizing the sewer line and road crossing for the Hunters Brooke

---

**21.** That said, Hunters Brooke, LLC still proceeds at its own risk should the Corps' reformulated decision after remand be determined to be arbitrary and capricious.

subdivision, near Indian Head, Charles County, Maryland;

B) The Motion is DENIED insofar as it seeks vacatur of said decision of U.S. Army Corps of Engineers or an injunction against construction at the Hunters Brooke site;

C) Although the Court does not enjoin construction activities at either the Hunters Brooke or Falcon Ridge sites or at adjacent sites, it should be understood by Intervenor, Hunters Brooke LLC, that it proceeds at its own or risk should this matter return to this Court and should the Court ultimately decide that the U.S. Army Corps of Engineers acted arbitrarily and capriciously with regard to its decision;

2. The Motion for Summary Judgment of U.S. Army Corps of Engineers [Paper No. 40] is DENIED WITHOUT PREJUDICE;

3. The Motion of Hunters Brooke, LLC [Paper No. 37] is DENIED WITHOUT PREJUDICE; and

4. The Clerk shall REMAND this case to the U.S. Army Corps of Engineers for further proceedings consistent with the Court's Opinion.