**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED SENIORS ASSOCIATION,
INCORPORATED,

*Petitioner,*

v.

SOCIAL SECURITY ADMINISTRATION,
*Respondent.*

No. 04-1804

NATIONAL TAXPAYERS UNION,
*Amicus Supporting Petitioner.*

On Petition for Review of an Order
of the United States Department of Health and Human Services.
(C-02-061)

Argued: May 26, 2005

Decided: August 25, 2005

Before WILLIAMS and SHEDD, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Petition for review denied by published opinion. Judge Williams
wrote the opinion, in which Senior Judge Hamilton joined. Judge
Shedd wrote a separate concurring opinion.

## COUNSEL

**ARGUED:** Robert Ronold Sparks, Jr., SPARKS & CRAIG, L.L.P.,
McLean, Virginia, for Petitioner. Tara Leigh Grove, UNITED

STATES DEPARTMENT OF JUSTICE, Appellate Staff, Civil Division, Washington, D.C., for Respondent. **ON BRIEF:** Peter D. Keisler, Assistant Attorney General, Mark B. Stern, Michael S. Raab, UNITED STATES DEPARTMENT OF JUSTICE, Appellate Staff, Civil Division, Washington, D.C., for Respondent. Michael E. Geltner, GELTNER & ASSOCIATES, P.C., Washington, D.C., for Amicus Supporting Petitioner.

---

## OPINION

WILLIAMS, Circuit Judge:

United Seniors Association, Inc. (USA) petitions for review of a decision of the Department of Health and Human Services' Departmental Appeals Board (the Board) upholding a determination by an administrative law judge (ALJ) that envelopes mailed by USA violated § 1140 of the Social Security Act, 42 U.S.C.A. § 1320b-10 (West Supp. 2005). The Board also upheld a $554,196 civil penalty imposed by the ALJ against USA. Because we find that § 1140(a)(1) applies to envelopes, that substantial evidence exists to support the ALJ's finding that USA's envelopes violated § 1140(a)(1), and that § 1140(a)(1) is not unconstitutionally vague or overbroad, we deny the petition for review.

### I.

"More than nine out of ten individuals age[d] 65 and older receive Social Security benefits," and "about two thirds of [those] Social Security beneficiaries receive 50% or more of their income from Social Security." Social Security Basic Facts, *available at* http://www.ssa.gov/pressoffice/basicfact.htm (March 23, 2005). Congress, in 1988, enacted § 1140 in order to combat what it viewed was a rise in deceptive mailings targeting seniors. 42 U.S.C.A. § 1320b-10. In passing § 1140, Congress sought to protect Social Security recipients from potential identity theft, from spending their Social Security benefits on organizations camouflaging as governmental entities, and from endless solicitations. Congress was concerned that the number of "[m]ass mailing appeals to Social Security beneficiaries" with "in-

accurate and misleading information" was dramatically increasing. *Misleading & Deceptive Mailings to Social Security Beneficiaries*, Hearing Before the Subcommittee on Social Security of the Committee on Ways and Means, 100th Cong. 2 (1987). Congress also sought to preserve the line of communication between the SSA and its recipients because of its fear that if recipients were inundated with deceptive mailings, there would be an "increase[d] . . . likelihood that true Government mailings will be destroyed without being opened." House Comm. on Ways and Means, 102d Cong., Report on Deceptive Solicitations 5 (Comm. Print 1992).

To that end, § 1140 prohibits the misuse of "symbols, emblems, or names in reference to Social Security" in hopes of preventing confusion by Social Security recipients. *Id.* In relevant part, § 1140(a)(1) states the following:

(a)  Prohibited acts

(1)  No person may use, in connection with any item constituting an advertisement, solicitation, circular, book, pamphlet, or other communication, or a play, motion picture, broadcast, telecast, or other production, alone or with other words, letters, symbols, or emblems - -

> (A)  the words "Social Security", "Social Security Account", "Social Security System", "Social Security Administration", "Medicare", "Centers for Medicare & Medicaid Services", "Department of Health and Human Services", "Health and Human Services", "Supplemental Security Income Program", "Medicaid", "Death Benefits Update", "Federal Benefit Information", "Funeral Expenses", or "Final Supplemental Plan", the letters "SSA", "CMS", "DHHS", or "SSI", or any other combination or variation of such words or letters . . . in manner which such person knows or should know would convey, or in a manner which reasonably could be interpreted or construed as conveying, the false impression that such item is

approved, endorsed, or authorized by the Social
Security Administration. . . .

*Id.* By statute, the Social Security Administration (SSA) is charged
with the enforcement of this provision. 42 U.S.C.A. § 1320b-10(d).

USA is a nonprofit, lobbying and advocacy group organized to
educate and mobilize senior citizens on a variety of issues affecting
them, including Social Security benefits. In 2002, USA reported total
revenues of $24,975,370 and a net profit of approximately $500,000.
USA solicits money and other support from individuals through mass
mailings. USA designs its envelopes to entice recipients to open the
envelopes, and it mails information and solicitations repeatedly to the
same people.

Two envelopes used by USA form the basis of this action. *See*
Attachments. The first envelope has the words "SOCIAL SECUR-
ITY" printed in bold letters across the top of the envelope. (Attach-
ment A) The front of the envelope is designed to resemble a FedEx
or express mail letter. There is a box labeled "Handling Instructions"
in which the options "Urgent Alert", "Express Service", and "Stan-
dard Delivery" appear, and the small box beside "Urgent Alert" is
marked with a red check. (J.A. 49.) The envelope also displays a
package tracking number. Around the perimeter of the envelope, the
words "SOCIAL SECURITY ALERT" appear over and over. United
Seniors Association, Inc. is listed as the sender of the letter. (J.A. 49.)
The envelope label also contains a block authorizing delivery without
a signature. On the back of this envelope, the message "—URGENT
— . . . SOCIAL SECURITY INFORMATION ENCLOSED"
appears. (J.A. 50.) The "SOCIAL SECURITY ALERT" border is also
printed on the back of the envelope. (J.A. 50.) The second envelope
in dispute contains essentially the same design, but the "SOCIAL
SECURITY ALERT" border is not present. The second envelope is
a snap mailer, which is opened by pulling off the perforated edge of
the envelope. The snap mailer directs the recipient "TO OPEN
IMMEDIATELY." (Attachment B) The rear of the second envelope
contains the message "SOCIAL SECURITY INFORMATION
ENCLOSED." (J.A. 53.)

The SSA began receiving complaints concerning USA's mailings,
and, after a review of USA's mailings, the SSA determined that USA

had violated § 1140(a)(1). Acting on that determination, in September 1996, the SSA began discussions with USA regarding USA's alleged breaches of § 1140(a)(1) and continued these discussions until the issuance of a penalty letter in August 2001. The SSA's penalty letter advised USA that it had mailed 554,196 envelopes that violated § 1140(a)(1) and imposed a fine of $554,196 — one dollar per envelope. Upon receipt of the penalty letter, USA requested a hearing before an ALJ, as provided under the Social Security regulations. 20 C.F.R. § 498.109(b)(2004).

The ALJ held an evidentiary hearing on April 8, 2003, during which the SSA presented a postal inspector with the United States Postal Service, who described the misleading nature of USA's envelopes. The postal inspector testified that USA's mailers were standard or third class mail and the additional instructions on the envelopes such as the tracking number, handling instructions, and authorization for delivery without signature served no legitimate postal function. The postal inspector also testified that the red ink used for the "SOCIAL SECURITY ALERT" border in contrast to the black ink used for the sender's address is a technique generally used by mass mailers to detract attention from the sender block and focus attention on the Social Security message. The postal inspector further testified that from viewing the envelope, it appeared USA was trying to disguise the mass mailing nature of its envelopes and that a recipient of such an envelope would "[a]t first glance" believe it to be from the SSA and to contain Social Security information.

The SSA also presented testimony from a professor of elder law employed with the American Association of Retired Persons, who opined that typical Social Security recipients would believe that USA's envelopes "contain[ed] information about their social security benefit." (Transcript of proceedings before the ALJ, April 8, 2003 at 178.) The professor also testified that the checkmark beside "Urgent Alert" would direct elder recipients "to the fact that [the information] was urgent and it was important for them to open [the envelope] very promptly." (Transcript at 179.) The professor noted that such a technique was standard for mass marketers "to create a sense of urgency for the person to open the envelope." (Transcript at 180.) The professor further testified that a typical elderly Social Security recipient would be more inclined to open USA's envelopes than to dispose of

them because of the prominent display of "Social Security" on the envelope and because the typical recipient would believe the envelopes were official documents.

In response, representatives from USA testified that USA wanted recipients to focus their attention on the message of the mailing, not USA as the sender. USA's representatives also conceded that the envelopes were targeted to senior citizens.

Based on the testimony and his own review of the contested envelopes, the ALJ found that USA's envelopes violated § 1140(a)(1) and that the $554,196 fine was reasonable. USA appealed the ALJ's decision to the Board which adopted the ALJ's decision. The SSA Commissioner chose not to exercise her discretion to modify or revise the Board's decision and consequently, the ALJ's decision became the final decision of the Board. USA has petitioned for review of the Board's decision and we have jurisdiction under 42 U.S.C.A. § 1320a-7a(e)(West 2003).[1] Because the Board adopted the ALJ's decision, we review the merits of the ALJ's decision.

## II.

In its petition for review, USA argues that § 1140(a)(1) does not apply to envelopes alone, that substantial evidence does not support the ALJ's finding that USA's envelopes violated § 1140(a)(1), and that § 1140(a)(1) is unconstitutionally vague and overbroad.[2] We address each argument in turn.

## A.

## 1.

USA's primary argument is that § 1140(a)(1) does not apply to envelopes at all. We review de novo questions of law. *Crutchfield v. County of Hanover*, 325 F.3d 211, 218 (4th Cir. 2003).

[1]We have accepted an amicus curiae brief from the National Taxpayers Union in support of USA urging the court to grant the petition for review.

[2]USA does not contest the reasonableness of the civil penalty.

"When interpreting statutes, we start with the plain language." *U.S. Dep't of Labor v. North Carolina Growers Ass'n*, 377 F.3d 345, 350 (4th Cir. 2004). "In fact, 'when the statute's language is plain, the sole function of the courts is to enforce it according to its terms.'" *Discover Bank v. Vaden*, 396 F.3d 366, 369 (4th Cir. 2005) (quoting *U.S. ex rel. Wilson v. Graham County Soil & Water Conserv. Dist.*, 367 F.3d 245, 247 (4th Cir. 2004)). When interpreting a statute, we must give words their "common and ordinary meaning." *Id.* If there is an ambiguity in a statute and "it is apparent that Congress would expect the agency 'to speak with the force of law when it addresses [the] ambiguity' . . ., a reviewing court must accept the agency's construction of that statute so long as it is 'reasonable.'" *Id.* (quoting *United States v. Meade Corp.*, 533 U.S. 218, 229 (2001)).

As relevant here, § 1140(a)(1) prohibits the use of the words "Social Security" "in connection with any item constituting an advertisement, solicitation, circular, book, pamphlet, or other communication . . . alone or with other words, letters, symbols, or emblems." 42 U.S.C.A. § 1320b-10(a)(1). USA argues that envelopes are not included in § 1140(a)(1) because, under the "rule of the last antecedent," the words "other communication" merely modify "advertisement, solicitation, circular, book, and pamphlet" by covering the contents of those items, and they cannot be read to expand the list to include envelopes. USA's argument indicates a misunderstanding of the rule of the last antecedent. According to the rule of the last antecedent, "a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 124 S.Ct. 376, 384 (2003). The Supreme Court provided a simple example of the rule of the last antecedent in *Barnhart v. Thomas*: If "parents, who before leaving their teenage son alone in the house for the weekend, warn him, 'You will be punished if you throw a party or engage in any other activity that damages the house,'" the limiting clause "that damages the house" modifies only the last antecedent "any other activity" and not "a party." *Id.* Thus, the teenager could be punished for throwing a party regardless of whether damage occurred to the house. *Id.; see also Jama v. Immigration & Customs Enforcement*, 125 S.Ct. 694, 701 (2005)(applying last antecedent rule to hold that provision in 8 U.S.C.A. § 1231(b)(1)(E)(vii) stating that the country to which an alien is deported must accept the alien does not also apply to § 1231 (b)(2)(E)(i-vi)). In the present case, the rule

of the last antecedent is not applicable to the words "other communication" because the words are not limiting or referential. Instead, the noun phrase "other communication" denotes a member of the list. *See* Wilma R. Ebbitt & David R. Ebbitt, *Index to English* 193 (8th ed. 1990).

Under the doctrine of *ejusdem generis*, however, § 1140 does contain a latent ambiguity. According to *ejusdem generis*, "when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with the specific enumeration." *Norfolk & Western Ry. Co. v. Am. Train Dispatchers*, 499 U.S. 125, 129 (1991). Applying the doctrine here, "other communication" should be read to refer only to a communication similar to "advertisement, solicitation, circular, book, [and] pamphlet." One could reasonably conceive that envelopes, as folded containers for messages, and which usually convey only cursory information to a recipient, are dissimilar to advertisements, solicitations, books, pamphlets, and circulars, which are used to persuade, educate, or inform a recipient on matters more in-depth than just the name and address of the addressor and addressee. On the other hand, in some instances, an envelope may convey additional information to a recipient. For example, a business may state on the outside of an envelope that it is having a sale in which case the envelope could function like an advertisement. Thus, because "other communication" "neither plainly compels nor clearly precludes [USA's] interpretation, . . . its precise import is ambiguous and certainly not free from doubt." *Humanoids Group v. Rogan*, 375 F.3d 301, 306 (4th Cir. 2004)(internal quotation marks omitted).

Because § 1140(a)(1) is ambiguous as to whether envelopes constitute "other communication[s]," we examine the SSA's interpretation of the statute. "When a court reviews an agency's construction of a statute that it administers, [the court] employs the deferential standard of review articulated in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)." *E.E.O.C. v. Seafarers Int'l Union*, 394 F.3d 197, 200 (4th Cir. 2005). Under *Chevron*, we "ask whether the agency's rule is a permissible interpretation of its organic statute." *Id.* at 205. The ALJ, in a formal ruling and after the benefit of a hearing, determined that the SSA's position, that "other communication[s]" include envelopes, was a reasonable interpretation of

the statute that Congress empowered the SSA to enforce.[3] We have no difficulty concluding that the ALJ's determination, that envelopes are a form of communication that may be prohibited under § 1140(a)(1), is a reasonable interpretation of the statute.

USA argues that we owe no deference to the ALJ's decision because this is a matter of pure statutory construction and *Chevron* deference therefore is not applicable. We reject USA's argument. Congress has entrusted to the SSA and to the Department of Health and Human Services the protection of the government's lines of communication with its citizens on matters related to Social Security, 42 U.S.C.A. § 1320b-10(d), and the determination of what communications threaten these lines "falls squarely within the agency's" and the department's expertise. *Seafarers,* 394 F.3d at 201 (finding *Chevron* applicable because the statutory interpretation at issue involved a "multitude of issues that fall squarely within the agency's special competence"). Accordingly, we defer to the SSA's interpretation of § 1140(a)(1) and conclude that envelopes are "other communication[s]" under that statute.

2.

USA next argues that even if envelopes are covered under § 1140(a)(1), the contents of an envelope must be examined along with the envelope itself to determine if the envelope creates a false impression that it is approved or endorsed by the government. We agree with the ALJ that the plain language of § 1140(a)(1) supports a contrary interpretation. Because envelopes themselves are "other communication[s]" and because an envelope itself can include words, letters, symbols, or emblems that create a "false impression that such item is approved, endorsed, or authorized by the Social Security Administration," the use of the prohibited words, phrases, and abbreviations on envelopes alone can violate § 1140(a)(1). 42 U.S.C.A. § 1320b-10. For example, if an organization used posters to advertise for a television broadcast and the posters conveyed the false impres-

---

[3]Although the interpretation in this case arises from a formal adjudication, not a notice and comment rule, the Supreme Court has had no trouble applying *Chevron* in such cases. *See e.g.*, *INS v. Aquirre-Aquirre*, 526 U.S. 415, 423-25 (1999).

sion that the SSA endorsed the posters, the organization could not defend the posters on the ground that no broadcast viewer could reasonably believe the SSA endorsed the broadcast. Once the viewer tunes into the broadcast, the misleading poster already will have accomplished its purpose. Thus, the poster advertisements would constitute a separate "communication" under § 1140(a)(1). Similarly, once a recipient of a misleading envelope opens the envelope and begins reading its contents, the deceptive "communication" has served its purpose.

USA's reading of the statute simply does not comport with the plain language of § 1140(a)(1). We find no error in the ALJ's conclusion that envelopes alone may violate § 1140(a)(1).

B.

Next, USA argues (1) that the ALJ erred by finding that its envelopes violated § 1140(a)(1) because the ALJ did not require evidence that recipients of USA's envelopes were actually misled and (2) that a recipient of USA's envelopes could not reasonably be misled into thinking the mailings were from or endorsed by the SSA. We address each claim below.

We review the ALJ's factual findings to determine if they are supported by substantial evidence. 42 U.S.C.A. § 1320a-7a(e). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)(quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

To violate § 1140(a)(1), the words "Social Security" must be used "in a manner which [the user] knows or should know would convey, or in a manner which reasonably could be interpreted or construed as conveying, the false impression that such item is approved, endorsed, or authorized by the Social Security Administration." 42 U.S.C.A. § 1320b-10. The ALJ found: (1) that USA intended to mislead recipients into thinking that the SSA authorized, endorsed, or approved their envelopes; and (2) that a recipient could reasonably construe

USA's envelopes to convey an impression of approval, endorsement, or authorization by the SSA.

Addressing USA's first contention, that the ALJ erred by finding USA liable without evidence that recipients were actually being misled, we conclude substantial evidence supported the ALJ's conclusion. The baseline inquiry under § 1140(a)(1) is whether the envelopes reasonably *could* be interpreted or construed, to have conveyed the false impression that the SSA approved, endorsed, or authorized USA's envelopes, not whether a recipient in fact interpreted or construed them in that way. Admittedly, this test creates a relatively low threshold to support a finding of liability. Nonetheless, § 1140(a)(1) provided the ALJ with the authority to find USA liable under § 1140(a)(1) based on the sample envelopes provided to the court, even without evidence of actual confusion by recipients.

USA's second contention — that no recipient reasonably could have construed the envelopes to have been endorsed, authorized, or approved by the SSA — also fails. The ALJ found that the words "Social Security" on the envelope were "part of an overall design that clearly conveys the impression that the envelope contains important Social Security information sent from an official source." (J.A. 32.) The ALJ found that the envelopes' address labels gave recipients the impression that the mailer is from an official source because the labels resembled express mail or overnight delivery labels. (J.A. 32.) For example, the address labels contain fake perforations similar to the perforated labels found on FedEx labels. The ALJ reasoned that the envelopes' resemblance to overnight, express mail, or FedEx labels "impart[ed] an official quality . . . . [because] [a]n overnight delivery or express mail envelope is expensive to send and the recipient would understand that this mode of transmission is used to expedite and assure delivery of important information of an urgent quality." (J.A. 32.) The ALJ further noted that a person "could easily conclude, based on the use of the words 'Social Security' and similar phrases in conjunction with the envelope's apparent express or overnight mode of delivery, that the envelope contained something official relating to that recipient's Social Security benefits." (J.A. 33.) Although the ALJ recognized that, upon close scrutiny of the postage stamp, a sophisticated recipient could discern that the envelopes were sent via bulk mail from a non-profit organization and that the enve-

lopes did not resemble those used by the SSA, the ALJ gave little weight to these findings in reaching his conclusion because a recipient, in deciding whether to open the envelope would not immediately recall what SSA envelopes looked like, nor would a recipient closely examine the envelope's postage stamp. Additionally, the ALJ found that, although a recipient could conclude by closely examining the envelopes that USA sent the mailers, a recipient still may not be able to determine whether the SSA approved, endorsed, or authorized the envelopes. (J.A. 36.)

In reaching the conclusion that USA's envelopes violated § 1140(a)(1), the ALJ also compared USA's envelopes to an envelope that the SSA found to have permissibly used the words "Social Security." (J.A. 36.) The SSA approved an envelope which contained the message "IMPORTANT NEW INFORMATION ENCLOSED ON: PENDING SENATE ACTION ON THE SOCIAL SECURITY LOCK BOX BILL." (J.A. 36.) The ALJ distinguished this envelope by finding that the approved envelope did not include "ambiguous references to Social Security that might mislead a person into believing that [this envelope] is from or authorized by the SSA or that it contains information about a recipient's Social Security benefits." (J.A. 36.)

We conclude that substantial evidence supports the ALJ's findings. The repeated references to "Social Security", the "Social Security Alert" border, the phony handling instructions, and the envelopes' resemblance to special shipping methods could reasonably lead recipients to believe that the envelopes contain official information relating to their Social Security benefits that must be dealt with at the earliest moment. Testimony from the elder law professor confirms that envelopes, such as those used by USA, tend to mislead and confuse elderly recipients into believing the envelopes bear official business. Given our deferential standard of review, we affirm the ALJ's finding that USA's envelopes violated § 1140(a)(1).

## C.

Finally, USA argues that § 1140(a)(1) is unconstitutionally vague and overbroad under the First Amendment. We review such claims de

novo. *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 511 (4th Cir. 2002).[4]

> In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. The court should then examine the facial vagueness challenge. . . .

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982)(footnotes omitted).

In addressing USA's overbreadth challenge, we note that "the overbreadth doctrine is 'strong medicine' to be applied 'sparingly and only as a last resort.'" *Am. Life League Inc. v. Reno*, 47 F.3d 642, 653 (4th Cir. 1995)(quoting *Broadnick v. Oklahoma*, 413 U.S. 601, 613 (1973)). "[T]o prevail, an overbreadth [challenge] . . . must demonstrate that a regulation's overbreadth is not only real, but substantial as well, judged in relation to the challenged regulation's plainly legitimate sweep and also that no limiting construction or partial invalidation could remove the seeming threat or deterrence to constitutionally protected expression." *Bason*, 303 F.3d at 513(internal citations omitted).

USA first contends that by construing § 1140(a)(1) to apply to envelopes alone, the statute is overbroad because it suppresses the protected speech within the envelopes. This argument is without merit. Assuming the contents of USA's envelopes contained non-deceptive materials, nothing in § 1140(a)(1), nor in the ALJ's decision, prohibits USA from mailing the same information in a non-deceptive envelope.

USA next contends that §1140(a)(1) is overbroad because its prohibition on the use of the words "in a manner which reasonably could

---

[4]Although USA, in some manner, challenged § 1140(a)(1) as violative of the First Amendment before the ALJ, the ALJ did not address the challenge because the ALJ does not have the authority to address constitutional challenges to federal statutes. 20 C.F.R. § 498. 204(c)(2004).

be interpreted or construed" as conveying the "false impression" of governmental endorsement amounts to the imposition of strict liability upon users of the words. We begin by examining the type of speech § 1140(a)(1) proscribes. The statute's prohibition reaches both commercial and non-commercial speech; however, in both contexts the prohibition merely restricts the manner in which the words can be used. The statute's prohibition on commercial speech need not detain us long because the overbreadth doctrine does not apply to commercial speech. *Hoffman Estates*, 455 U.S. at 497. The statute's prohibition on non-commercial speech, however, gives us pause.

Section 1140(a)(1) has two prongs. The first prong of the statute plainly reaches only deceptive speech by prohibiting uses of the words that a person "knows or should know would convey" the false impression of governmental endorsement, approval, or authorization. Although "[t]he First Amendment protects the right to engage in charitable solicitation, [it] . . . does not shield fraud" or deceptive speech. *Illinois v. Telemarketing Assoc., Inc.*, 538 U.S. 600, 611-612 (2003). Instead, "like other forms of public deception, fraudulent charitable solicitation is unprotected speech." *Id.* (citing *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 190 (1948) (the power to "protect people against fraud" has "always been recognized in this country and is firmly established")). One who intends to mislead individuals into thinking that the government has endorsed his message is not entitled to First Amendment protection, nor is one whose message is so deceptive and misleading that he should have known that the message conveyed the false impression of governmental endorsement. *Cf. Downs v. L.A. Unified School Dist.*, 228 F.3d 1003, 1017 (9th Cir. 2000)(observing that private citizens have "no First Amendment right to speak for the government").

USA contends that the government can only regulate charitable solicitation to prevent actual fraud. We disagree. The Court has acknowledged that a "direct and substantial limitation on protected activity" can be sustained if "it serves a sufficiently strong, subordinating interest." *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 636 (1980). The government has a substantial interest in protecting Social Security, as the financial lifeline of most senior Americans, and it has a strong interest in protecting Social Security recipients from deceptive mailings. Thus, to the extent that

§ 1140(a)(1) regulates the manner in which a charity may solicit, it is constitutional because of the overriding governmental interest.

The second prong of § 1140(a)(1), however, bars use of the words "which *reasonably could* be interpreted or construed as conveying, the false impression" of governmental endorsement, approval, or authorization and is the prong to which USA objects. Because this prong does not require the speaker to have an intent to deceive, the second prong possibly could reach some protected speech. We recognize, however, that any such non-commercial, non-deceptive speech protected by the First Amendment constitutes, at most, a minuscule portion of the speech reached by the statute. In fact, USA has not suggested a single instance in which a use of one of the nineteen proscribed words "reasonably could" be construed as conveying the false impression of governmental endorsement without also constituting a use that a "person knows or should know" would convey a false impression of governmental endorsement. For instance, in this case, the ALJ found that USA knew or should have known that its envelopes were misleading *and* that the envelopes reasonably could be construed as conveying the false impression of governmental endorsement. The second prong thus overlaps significantly with the first prong. Without evidence of the statute's substantial burden on protected speech and in light of the important governmental interests protected by the statute, we conclude that § 1140(a)(1) is not unconstitutionally overbroad.

Having determined that § 1140(a)(1) is not unconstitutionally overbroad, but that it might burden some protected speech, we turn to USA's vagueness challenge. "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). USA contends that a direct-mail organization, such as itself, cannot discern when uses of the words listed in § 1140(a)(1) "could reasonably be interpreted or construed as conveying, the false impression that such item is approved, endorsed, or authorized by the Social Security Administration."

As discussed in our analysis of USA's overbreadth challenge, the vast majority of violators of § 1140(a)(1) will be adjudged in violation under the first prong because they knew or should have known that their communication would convey a false impression of governmental endorsement. USA contends that the statute's second prong is unconstitutionally vague, but does not mount a serious vagueness challenge to the statute's first prong. Having determined that the first prong, will subsume most of the second prong, we reject USA's vagueness challenge. "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *Hill*, 530 U.S. at 733.[5]

We therefore reject USA's constitutional challenges to § 1140(a)(1) because "[a]ll that is at issue is a statute that forbids the impersonation of a federal agency by a private organization bent on sowing confusion among beneficiaries of a program and thereby thwarting the purposes it was intended to serve." *National Taxpayers Union v. U.S. Social Security Admin.*, 376 F.3d 239, 244 (4th Cir. 2004) (Wilkinson, concurring).

### III.

In summary, we affirm the ALJ's conclusion that § 1140(a)(1) applies to envelopes and that USA's envelopes violated § 1140(a)(1), and we find no merit in USA's argument that § 1140(a)(1) is unconstitutionally vague or overbroad.

*PETITION FOR REVIEW DENIED*

---

[5]In any event, § 1140(a)(1) is not unconstitutionally vague. It proscribes, in "clear, common" language, *American Life League*, 47 F.3d at 653, using nineteen specific words and phrases in a manner that could reasonably confuse or deceive the intended audience. As we noted in *American Life League*, the objective standard of reasonableness is not unconstitutionally vague. *Id.*

SHEDD, Circuit Judge, concurring:

I agree with my colleagues that substantial evidence supports the ALJ's conclusion that the envelopes distributed by United Seniors Association, Inc. ("USA") bore references to "Social Security" that violate § 1140 of the Social Security Act. I also agree that § 1140 is constitutional on its face and that it properly applies to envelopes such as those at issue in this case. I disagree, however, with the notion that there is an ambiguity in the statute that calls for deference to the ALJ's interpretation. To the contrary, I believe that the statute applies to USA's envelopes by its plain terms and contains no ambiguity.

Section 1140 applies to uses of the phrase "Social Security" (and other words, phrases, and symbols) "in connection with any item constituting an advertisement, solicitation, circular, book, pamphlet, or other communication." Thus, the statute applies to USA's envelopes if *either* (1) the envelopes are themselves "other communication[s]" *or* (2) the envelopes are "in connection with" an advertisement, solicitation, circular, book, pamphlet, or other communication.

The phrase "other communication" refers to a communication similar in nature to advertisements, solicitations, circulars, books, and pamphlets. Unlike my colleagues, I do not believe that this phrase is ambiguous simply because some envelopes may satisfy this condition while others may not. That fact does not suggest that the statutory term is susceptible to multiple reasonable interpretations. It seems clear to me that an "other communication" must be similar to the specified items in the nature of the information it conveys, not the nature of the medium. The statute does not exclude from coverage any particular medium of communication; it certainly does not exclude envelopes. Common experience confirms that envelopes may do more than merely carry contents. For example, direct-mail pieces often bear external messages urging recipients to pay attention to the mailing. Such direct-mail pieces are similar to postcards, which bear not just ordinary postal information but also the sender's own messages.

Any "item" that constitutes a communication similar to the listed items is covered by § 1140. An envelope is an "item," so the pertinent question is whether the particular envelope at issue in a given case

constitutes a communication similar to an advertisement, solicitation, circular, book, or pamphlet in the nature of the information it conveys. These items share a single characteristic: They express messages from the sender to the recipient concerning the sender's business or interest. Thus, an envelope bearing on its surface messages from the sender to the recipient concerning the sender's business or interest is a communication that is covered by § 1140. Because USA's envelopes express USA's own message related to time-sensitive Social Security information, they are "other communication[s]" subject to regulation under § 1140.

Even if it were not so clear that USA's message-bearing envelopes were themselves "other communication[s]," there can be no doubt that USA used those envelopes "in connection with" their contents. Since USA acknowledges that the contents of USA's envelopes were, in fact, advertisements or solicitations, Brief of Pet'r at 4, § 1140 plainly applies to the messages printed on those envelopes.